2020 UT App 57

# THE UTAH COURT OF APPEALS

COOK MARTIN POULSON PC,
Appellee,
*v.*
DANIEL G. SMITH,
Appellant.

Opinion
No. 20180488-CA
Filed April 9, 2020

First District Court, Logan Department
The Honorable Kevin K. Allen
No. 140100505

Russell S. Walker, Troy L. Booher, and Beth E.
Kennedy, Attorneys for Appellant

Thomas J. Burns and Aaron R. Harris, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Daniel G. Smith appeals the district court's finding of
contempt against him, entry of sanctions, entry of final judgment
in favor of Cook Martin Poulson PC (CMP), and entry of
summary judgment on Smith's third-party complaint against

CMP shareholders Troy Martin, Richard Poulson, Kirk Eck, and John Adams.[1] We reverse in part and affirm in part.

## BACKGROUND

¶2      Smith began working as an accountant for CMP in 1995. Each year through 2004, Smith signed an Employment Agreement. The 2004 agreement permitted Smith's termination if he failed "to faithfully and diligently perform duties of his employment." It also included a non-compete provision, which prohibited Smith, for a period of two years following his termination, from providing "accounting services to any client for whom [CMP] has performed accounting services during the twelve-month period immediately preceding the termination of [Smith's] employment." The agreement further provided that in the event Smith breached the non-compete provision, CMP would be entitled to liquidated damages equal to 150% of what it had billed the clients to whom Smith provided services during the twelve-month period preceding his termination.

¶3      In 2005, Smith became one of five shareholders in CMP, pursuant to a Shareholders' Agreement. The Shareholders' Agreement granted CMP the "right to purchase all of [a] Shareholder's shares" if the shareholder "engages in one or more acts that in the unanimous opinion of the remaining Shareholders, is discreditable." The agreement outlined how the value of the shares would be calculated as well as the manner and timeframe in which the buyout would be paid. The agreement also included a non-compete clause in which each shareholder agreed not to "perform[] accounting services" for

_____

1. Throughout this opinion, we refer to CMP and the third-party defendants collectively as CMP except where the distinction is relevant.

two years following termination of employment with CMP "to any client for whom [CMP] or Shareholder has performed accounting services during the five year period immediately preceding the termination of Shareholder's employment." Finally, the agreement provided that if a shareholder violated the non-compete provision after having been bought out under the discreditable acts provision, "the balance remaining on the note payable" for the buyout would "be deemed paid in full" and CMP would "have no further obligation" to that shareholder.

¶4     On July 31, 2014, CMP terminated Smith's employment "as a result of [his] failure to diligently perform the duties of his employment despite repeated requests for improvement and also as a result of discreditable acts committed by Smith during his employment with CMP." Specifically, CMP alleged that Smith (1) "Submitted falsified production reports and billing statements"; (2) "Failed to follow CMP's billing procedures"; (3) "Failed to follow CMP's written and institutionalized due diligence protocols"; (4) "Engaged in reckless oversight and preparation of tax returns, schedules, audits, and financial statements for numerous clients over many years"; (5) "Refused to comply with demands from other Shareholders that he follow CMP's billing procedures, due diligence protocols, and other policies"; and (6) "Provided accounting services for CMP clients and non-CMP clients without informing CMP of the work done while utilizing CMP-owned software, hardware, and other resources and while not billing those clients[] for the benefit of CMP, but instead billing the clients directly and accepting payment without transferring the funds to CMP." The other four shareholders also invoked the discreditable acts provision of the Shareholders' Agreement to buy Smith out of his shares.

¶5     Following Smith's termination, CMP learned that Smith was continuing to hold himself out as a CMP employee and was providing accounting services to a number of CMP clients. In

December 2014, CMP filed a complaint against Smith requesting a declaratory judgment regarding Smith's obligations and breaches under the Employment and Shareholders' Agreements; alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty; requesting liquidated damages for violation of the Employment Agreement; and requesting a temporary restraining order (TRO) and injunction prohibiting Smith from providing accounting services to CMP clients or from influencing any clients of CMP to terminate their relationship with CMP in violation of the agreements.

¶6    Smith filed an answer, counterclaim, and third-party complaint, which purported to add CMP's shareholders as third-party defendants. In opposing CMP's claims, Smith asserted, among other things, that the claims were barred by CMP's own breach of the agreements. Smith's counterclaim and third-party complaint asserted that it was CMP and its shareholders who breached the agreements and their duties of good faith by improperly reducing Smith's salary and distributions and forcing him out of the company. He further asserted that CMP and its shareholders had unjustly deprived him of his shares in CMP.

¶7    On April 15, 2015, the district court issued a TRO

> [e]njoining Smith from directly or indirectly, for himself or any third party, soliciting or having any contact with any current client of CMP, or soliciting any person, firm, or corporation who was a customer of CMP within the 12 month period immediately preceding the termination of Smith's employment, with regard to accounting or other services of the type CMP provides.

The court subsequently held a hearing on CMP's request for a preliminary injunction and, in a written memorandum decision,

granted the injunction. The court's memorandum decision stated that Smith was not to "work for, or provide services to, the clients [Smith] obtained while he was employed by [CMP]" and directed CMP's counsel to prepare an order in conformance with the court's memorandum decision. Smith objected to CMP's proposed order, and after another hearing, the court overruled Smith's objection and entered the order submitted by CMP's counsel. Significantly, the language of the preliminary injunction order tracked the TRO language except that the preliminary injunction order expanded the no-soliciting restriction to those who had been clients for five years previous to Smith's termination rather than just twelve months.

¶8    The parties then proceeded with discovery. On March 10, 2016, CMP filed a statement of discovery issues alleging that Smith's initial responses to its discovery requests "were incomplete and evasive." On May 24, 2016, the court ordered Smith to "provide supplemental responses to his discovery responses, responding in full to the information requested by [CMP], within 7 days," and to "produce all documents that are responsive to the Requests for Production propounded by [CMP] within 7 days." At the same time, the court issued a protective order permitting Smith to designate documents as confidential and prohibiting use or disclosure of such documents outside of the litigation.

¶9    Ten days after the court's order on discovery issues, Smith's counsel contacted CMP's counsel, offering to "produce the non-privileged documents . . . at [his] office at a time which is convenient." CMP's counsel pointed out that the court's deadline had passed and informed Smith's counsel that he expected the documents to be provided as ordered, but Smith's counsel continued to insist that the documents should be inspected on Smith's computer "as they are kept in the usual course of business." CMP's counsel responded that

the documents should be "produced in hard copy or electronic format" and requested that Smith's counsel arrange for CMP to "image the hard drive" of Smith's computer. Smith's counsel refused to cooperate with this request, and CMP filed a motion for order to show cause asking that Smith be held in contempt for failing to comply with the court's order on discovery issues.

¶10 In the meantime, CMP received information indicating that Smith had "continued to provide accounting services for several clients of CMP," allegedly in violation of the court's TRO and preliminary injunction order. CMP filed another motion for order to show cause requesting that Smith be held in contempt for his violation of these court orders.

¶11 In response, Smith admitted that he had provided accounting services to over 400 of CMP's former clients but maintained that he had not solicited any current CMP client, had served only "clients who approached him," and had not yet invoiced them. He also argued that he had not violated the injunction, because it was "wrongfully issued," and asserted that his actions had not harmed CMP. With respect to the production of documents, Smith argued that he could not be held in contempt because he had "repeatedly offered to provide CMP's counsel access to the computer" but that CMP's counsel had "refused to meet to inspect the information on Smith's computer."

¶12 The court was unimpressed with Smith's excuses. It found that Smith had "blatantly ignored the Court" and "unashamedly admit[ted] to doing so because he felt" the court's order was "wrongfully entered." The court stated that it did "not care if the clients contacted and requested [Smith] do their accounting, or that [Smith] has not invoiced them for the work done." The court further found that Smith had "ignored the time limitation" in the discovery order "and

refused to tender the requested documents in the specific requested form." The court stated, "Merely providing a one-time glance at a computer, 10 days after the Court's order, does not come close to comporting with [CMP's] request or the Court's order."

¶13 Based on these findings, the court held Smith in contempt and imposed sanctions. Specifically, it ordered Smith's counterclaim stricken from the record, granted CMP its attorney fees incurred in bringing the motions for order to show cause, and entered CMP's proposed findings of fact. These findings included a determination that Smith had engaged in the discreditable acts alleged by CMP in violation of the Shareholders' Agreement, that CMP followed the appropriate protocol outlined in the Employment Agreement in terminating Smith's employment, that Smith had violated the Employment Agreement and Shareholders' Agreement by providing accounting services to CMP clients after his termination, that his conduct relieved CMP of any obligation to pay him for his shares, and that the appropriate amount of damages, pursuant to the liquidated damages provision of the Employment Agreement, was $448,354. The court entered final judgment in favor of CMP on its claims and also ordered that Smith pay CMP's attorney fees, pursuant to the terms of the Shareholders' Agreement, which provided for an award of fees to the "non-defaulting party in enforcing this Agreement."

¶14 Relying on the court's findings, the third-party defendants also moved for summary judgment on Smith's claims against them. The court granted this motion, determining that its findings that Smith breached the Employment and Shareholders' Agreements precluded his claims against the third-party defendants.

¶15 Smith now appeals.

ISSUES AND STANDARDS OF REVIEW

¶16    Smith first argues that the district court erred by finding him in contempt for violating the preliminary injunction and for failing to comply with the court's discovery order. "When reviewing a district court's decision to find a party in contempt, we review the district court's findings of fact for clear error and its legal determinations for correctness." *Rosser v. Rosser*, 2019 UT App 25, ¶ 9, 438 P.3d 1047 (quotation simplified), *cert. granted*, 455 P.3d 1055 (Utah 2019). Ultimately, "the decision to hold a party in contempt of court rests within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court's action is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion." *Barton v. Barton*, 2001 UT App 199, ¶ 9, 29 P.3d 13 (quotation simplified).

¶17    Smith next asserts that the sanctions imposed for his violations were unduly harsh. We review the imposition of contempt or discovery sanctions for abuse of discretion. *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957; *Barton*, 2001 UT App 199, ¶ 9.

¶18    Finally, Smith argues that the district court's default findings were insufficient to support the summary judgments against Smith on CMP's claims and Smith's third-party complaint.[2] We review a court's grant of summary judgment for correctness, viewing "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving

---

2. Smith also asserts that the district court erred in denying his motion for partial summary judgment and his motion for new trial. However, his argument on these points is indistinguishable from his argument regarding the sufficiency of the findings, and we therefore do not address these points separately.

party." *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 15, 367 P.3d 994 (quotation simplified).

¶19   To the extent that Smith's arguments were not preserved in the district court, he has asked us to review them for plain error. Under plain error review, we will reverse only if "(i) an error exists, (ii) the error should have been obvious to the trial court, and (iii) the error is harmful." *In re A.T.I.G.*, 2012 UT 88, ¶ 22, 293 P.3d 276 (quotation simplified).

ANALYSIS

I. Contempt

¶20   Smith first asserts that the district court erred in holding him in contempt because it incorrectly determined that he had violated the preliminary injunction and discovery order. To establish contempt, three elements must be proven: (1) "that the person cited for contempt knew what was required," (2) that the person "had the ability to comply," and (3) that the person "intentionally failed or refused to do so." *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988), *superseded by statute on other grounds as stated in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991).

A.     Violation of Preliminary Injunction

¶21   On appeal, Smith asserts that while he provided accounting services for former clients, he did not violate the preliminary injunction because he did not solicit any of CMP's clients—he claims they all approached him first—and because the clients who approached him were all former (and not current) clients of CMP. He asserts that, with respect to former clients, the plain language of the injunction precludes him only from "soliciting," not from performing any services whatsoever. He maintains that the plain language of the preliminary injunction cannot be read as prohibiting him from performing

accounting services for former clients that he did not actively solicit and that the court therefore erred when it ruled that the preliminary injunction ordered Smith "not to do any accounting work" for former clients.

¶22    Smith did not preserve this argument in the district court.[3] Although Smith represented to the district court that he had provided services for only former clients who approached him first,[4] he did not assert, as he now does on appeal, that the

_____

3. Recent decisions from this court have noted that while our supreme court has acknowledged the "ongoing debate about the propriety of civil plain error review," that court has not resolved the debate for purposes of Utah law. *See Utah Stream Access Coal. v. Orange St. Dev.*, 2017 UT 82, ¶ 14 n.2, 416 P.3d 553 (questioning the applicability of civil plain error review); *Tronson v. Eagar*, 2019 UT App 212, ¶ 18 n.7, 457 P.3d 407 (recognizing that because the Utah Supreme Court has not yet resolved the debate about the applicability of plain error review in civil cases, "Utah appellate courts have sometimes applied plain error review in civil cases in which neither party challenges its application"); *Frugal Flamingo Quick Stop v. Farm Bureau Mutual Ins. Co.*, 2018 UT App 41, ¶ 10 n.3, 420 P.3d 57 (applying plain error review in a civil case without opining on its propriety). While CMP argues that this court should not reach Smith's challenge to the district court's finding of contempt for violating the preliminary injunction order because this issue was not preserved, CMP has not challenged the applicability of civil plain error review in this case. Thus, as we have done before, we decline to resolve that debate here and proceed to apply plain error review, without opining on the propriety of doing so. *See, e.g., Gerwe v. Gerwe*, 2018 UT App 75, ¶ 6 n.1, 424 P.3d 1113.

4. For purposes of our analysis, we accept Smith's assertions that he did not solicit former clients and that he did not provide

(continued…)

language of the preliminary injunction should be read to permit him to provide such services so long as he did not "solicit" the clients. Indeed, he claimed no confusion regarding the intent of the court's order and acknowledged that he had provided accounting and tax services for former CMP clients. Rather, he argued to the district court that the preliminary injunction was improperly entered because he, rather than CMP, owned the goodwill of the clients for whom he provided services and that he should not be held in contempt for his violation because he did not believe CMP had been harmed by his actions. The district court rejected these arguments, and Smith does not renew them on appeal.

¶23 Nevertheless, Smith asserts that we should review his new argument regarding the language of the injunction for plain error because he believes it should have been obvious to the district court that the plain language of the court's own injunction order prohibited Smith only from soliciting former clients, not from providing accounting services to former clients who reached out to him. We agree with Smith that the district court plainly erred in ruling that Smith violated the preliminary injunction merely by performing accounting-related services to CMP's former clients because, with respect to former clients, the plain language of the court's order prohibits Smith only from "soliciting any person, firm, or corporation who was a customer of CMP within the 5-year period immediately preceding the termination of Smith's employment."

---

(…continued)

services to any of CMP's current clients. On remand, the district court can certainly explore whether these assertions are true. If the court determines that Smith provided services to CMP's current clients or solicited any of CMP's former clients, it may elect to reinstate its contempt order.

¶24    To begin, "we interpret language in judicial documents in the same way we interpret contract language." *Iota LLC v. Davco Mgmt. Co.*, 2016 UT App 231, ¶ 33, 391 P.3d 239. "When interpreting a contract, we look to the language of the contract to determine its meaning . . . ." *Desert Mountain Gold LLC v. Amnor Energy Corp.*, 2017 UT App 218, ¶ 13, 409 P.3d 74 (quotation simplified). The plain language of the preliminary injunction order does not prohibit Smith from working for or providing services to former clients of CMP. The language of the preliminary injunction order instead enjoins Smith from "soliciting" former clients.

¶25    The findings and conclusions in the court's preliminary injunction ruling stated that the injunction was to "enforc[e] the covenants not to compete found in the employment or shareholder agreements" to prevent further harm to CMP resulting directly from "Smith providing accounting services to clients of CMP." They also stated that Smith would be expected to "compl[y] with the terms of the covenants not to compete, particularly that he will not work for, or provide services to, the clients he obtained while he was employed by CMP." Further, the court's memorandum decision following the preliminary injunction hearing stated that the court intended to enter an order that would prohibit Smith from "work[ing] for, or provid[ing] services to, the clients he obtained while he was employed by [CMP]." Both the district court and CMP relied on this language from the memorandum decision and the preliminary injunction's findings and conclusions to assert that the injunction required Smith not to work for former clients at all, regardless of who contacted whom. But we agree with Smith that this language did not effectively enjoin Smith from working for former clients, because the language appearing under the heading "PRELIMINARY INJUNCTION ORDER" enjoined him only from soliciting former clients and enjoined contact only with respect to current clients.

¶26    This court has determined that "to hold one in contempt of an order, that order must be clearly understood to be an order." *Salt Lake City v. Dorman-Ligh*, 912 P.2d 452, 455 (Utah Ct. App. 1996). Accordingly, injunctions must "be specific in terms and . . . describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Utah R. Civ. P. 65A(d). Further, for a violation of an order to justify sanctions, the "order must be sufficiently specific and definite as to leave no reasonable basis for doubt regarding its meaning." *Dorman-Ligh*, 912 P.2d at 455. Here, the plain language under the "PRELIMINARY INJUNCTION ORDER" heading specifically prohibited Smith from soliciting or contacting CMP's current clients and from soliciting CMP's former clients.[5] It did not prohibit all contact with former clients or all work for former clients. This portion of the order is the portion to which a reasonable person would have been expected to pay attention. Contradictory language in the findings and conclusions is simply not "sufficiently specific and definite" that it would have been read as undoubtedly modifying or adding to the clearly labeled "PRELIMINARY INJUNCTION ORDER." *See id.* This should have been obvious to the district court, and therefore, it was plain error for the court to find Smith in

---

5. We agree with Smith that it is notable that CMP's counsel drafted both the TRO and the preliminary injunction. The language in both orders prohibited Smith from soliciting and having contact with current clients and from soliciting former clients. In fact, before the district court entered the preliminary injunction, Smith objected to the form of the order and proposed a competing preliminary injunction order that "track[ed] the language set forth in the non-compete provision." Smith's proposed order would have enjoined Smith from "providing accounting services to any client for whom CMP has performed accounting services." But the district court overruled Smith's objections and entered the order drafted by CMP.

contempt for violating the preliminary injunction solely on the basis that Smith provided services to former clients.

¶27    CMP argues that Smith admitted to violating the injunction when he acknowledged that he performed accounting-related services for former CMP clients. But admitting that he performed the services is not the same as admitting that he violated the injunction. Smith consistently maintained that the clients approached him independently and that he "provided accounting services for certain former CMP clients . . . who approached him to do the work." The district court did not make a finding that Smith worked for current CMP clients or that he solicited former CMP clients, only that Smith was "ordered not to do any accounting work for those individuals." But the plain language of the preliminary injunction order did not prohibit Smith from working for former CMP clients, so long as he did not solicit them, and the district court plainly erred when it determined that Smith's admitted actions violated the terms of the preliminary injunction. Accordingly, the court exceeded its discretion in holding Smith in contempt for violating the preliminary injunction, and we reverse and remand for further proceedings.

B.    Violation of Discovery Order

¶28    Smith next asserts that he did not violate the discovery order, because he offered to produce the requested documents on his computer, as they were kept in the usual course of business. The court's discovery order instructed Smith to "produce all documents that are responsive to the Requests for Production propounded by [CMP] within 7 days." CMP's requests for production asked Smith to "make available any computer" he had "used to provide accounting services to any person at any time after July 31, 2014," and also asked him to provide "copies" of a number of different categories of "documents." In a section of its request defining "document,"

CMP asked Smith to provide "responsive data or data compilations kept in electronic form . . . in paper form where such is possible" or otherwise "downloaded to disk." Another provision several pages later requested that Smith provide "documents" "in the precise form and manner as they are kept in the usual course of business." It is undisputed that Smith made no attempt to produce any of the requested documents within the court's seven-day deadline and that, subsequently, he offered only to "meet and confer" at his attorney's office where he would "produce the non-privileged documents" by permitting CMP's counsel to "inspect the information on Smith's computer."

¶29　The court found that Smith had "ignored the time limitation, and refused to tender the requested documents in the specific requested form." The court found that CMP had requested that the documents be delivered in paper form or downloaded to disk and that Smith's offer to permit CMP "a one-time glance at a computer" did not comply with the court's order.

¶30　On appeal, Smith asserts that he complied with the requests for production by offering to let CMP's counsel inspect the documents on his computer because that is how he keeps the documents "in the usual course of business." *See* Utah R. Civ. P. 34(c)(1). In support of this assertion, he relies on rule 34(c) of the Utah Rules of Civil Procedure and language in CMP's request asking that "documents" be provided as "kept in the usual course of business."

¶31　Rule 34(c) of the Utah Rules of Civil Procedure provides,

> (c) Form of Documents and Electronically Stored Information.
>
> 　(1) A party who produces documents for inspection must produce them as they are kept in

> the usual course of business or must organize and label them to correspond with the categories in the request.
>
> (2) If a request does not specify the form or forms for producing electronically stored information, a responding party must produce the information in a form or forms in which it is ordinarily maintained or in a form or forms that are reasonably usable.

*Id.* R. 34(c)(1)–(2). Smith seems to be under the impression that subsection (c)(1) applies to the production of documents stored on his computer. But in context, it is clear that this provision applies to hard copy documents, while subsection (c)(2) applies to electronically stored documents. *See, e.g.*, *SolarCity Corp. v. Doria*, No. 16cv3085-JAH (RBB), 2018 WL 467898, at *5 (S.D. Cal. Jan. 18, 2018) (interpreting identical language used in the Federal Rules of Civil Procedure as being intended to govern production of hard copy documents and electronically stored information separately); *Anderson Living Trust v. WPX Energy Prod., LLC*, No. CIV 12-0040 JB/LFG, 2014 WL 930869, at *1, *13 (D.N.M. Mar. 6, 2014) (concluding that the term "documents" as used in rule 34 of the Federal Rules of Civil Procedure "does not include [electronically stored information]" and therefore does not require that such information be produced "in the usual course of business," and stating that the first subsection "governs hard copy documents" while the second "governs [electronically stored information], with no overlap between").

¶32 First, the rule distinguishes "electronically stored information" as a category separate from "documents." *See* Utah R. Civ. P. 34(a)(1) (listing "documents, electronically stored information, [and] tangible things" as three categories of discoverable items). Further, subsection (c)(2), pertaining specifically to production of electronically stored information,

would be rendered meaningless if "electronically stored information" were subsumed by the definition of "documents," since production of documents is already governed by subsection (c)(1). *See Hall v. Utah Dep't of Corr.*, 2001 UT 34, ¶ 15, 24 P.3d 958 (explaining that when we engage in statutory interpretation, we "seek to render all parts [of the provision] relevant and meaningful" and "avoid interpretations that will render portions of a statute superfluous or inoperative" (quotation simplified)). Thus, under rule 34(c)(2), Smith was required to produce the electronic information in the form requested by CMP or, if CMP did not specify, then the form "ordinarily maintained" or "reasonably usable." *See* Utah R. Civ. P. 34(c)(2).

¶33 Smith alternatively asserts that permitting CMP to look at the files on the computer complied with CMP's own request that he provide "documents" "in the precise form and manner as they are kept in the usual course of business." However, CMP also requested that all "responsive data or data compilations[6] kept in electronic form . . . be produced in paper form where such is possible . . . [or] downloaded to disk." Unlike rule 34, CMP's request explicitly included "all electronic information in all electronic storage media" in the definition of "documents." Nevertheless, reading the request as a whole, we agree with the district court that Smith should have understood that CMP was requesting

---

6. Smith asserts that the files on his computer could not be considered "data or data compilations." (Quotation simplified.) However, he makes no attempt to define this term or explain why the electronic files would not fall within this definition. *See Data*, Merriam-Webster.com, merriam-webster.com/dictionary/data [https://perma.cc/35EE-LZD6] (defining data as "information in digital form that can be transmitted or processed").

electronic information to be provided in paper or disk form. The more specific request regarding "data and data compilations" followed immediately after the language defining documents to include electronic information, whereas the usual-course-of-business language was included in a boilerplate paragraph several pages later. And as with rule 34, the inclusion of this separate instruction regarding electronic information would be superfluous and meaningless if we were to interpret the request as Smith suggests.

¶34 Additionally, as noted above, CMP's request asked Smith to provide "copies" of the requested documents. And CMP specifically identified the categories of documents that it wanted copies of. Smith could not have reasonably interpreted this request as one to merely view the documents on his computer; the specific request for copies made it clear that CMP was requesting the documents in a portable format.

¶35 The court's discovery order instructed Smith to "produce all documents that are responsive to the Requests for Production propounded by [CMP] within 7 days." CMP's request clearly asked for copies of electronic documents to be provided in paper format or on a disk. Yet Smith ignored the request and refused to provide the documents in any format other than viewed directly on his computer.[7] This was inconsistent with the court's order. Thus, the court did not exceed its discretion in holding Smith in contempt for violating the discovery order.

---

7. Smith also makes much of CMP's request that he deliver the entire computer hard drive for copying, asserting that this was not required by the court order. But the court did not base its determination on Smith's failure to deliver the hard drive; it based its determination on Smith's complete refusal to deliver any of the documents to CMP in either paper or disk form.

II. Sanctions

¶36    Smith asserts that the sanctions imposed for his violations of the preliminary injunction and the discovery order were excessive and exceeded the district court's discretion. Rule 37 of the Utah Rules of Civil Procedure permits courts to "impose appropriate sanctions for the failure to follow its orders." Utah R. Civ. P. 37(b). In doing so, the court may

> (1) deem the matter or any other designated facts to be established in accordance with the claim or defense of the party obtaining the order;
>
> (2) prohibit the disobedient party from supporting or opposing designated claims or defenses or from introducing designated matter into evidence;
>
> . . .
>
> (4) dismiss all or part of the action, strike all or part of the pleadings, or render judgment by default on all or part of the action; [and]
>
> (5) order the party or the attorney to pay the reasonable costs, expenses, and attorney fees, caused by the failure
>
> . . . .

*Id.* "The striking of pleadings, entering of default, and rendering of judgment against a disobedient party are the most severe of the potential sanctions that can be imposed upon a nonresponding party." *Marshall v. Marshall*, 915 P.2d 508, 515 (Utah Ct. App. 1996) (quotation simplified). Though we affirm the district court's determination that Smith violated the court's discovery order, we hold that the district court exceeded its discretion in holding Smith in contempt for violating the

preliminary injunction based solely on a finding that he provided accounting services to former clients. There is no way for this court to know whether the district court would have employed the same sanction based on the discovery violations alone. Because it is possible that the court would have entered other sanctions in response to the discovery violation alone, we must reverse the sanctions and remand for further proceedings.[8]

### III. Summary Judgment

¶37 Because summary judgment was based on the default findings that were imposed as a sanction, and we are unable to affirm the sanctions, we must necessarily also reverse the court's summary judgment rulings and its order regarding attorney fees. Nevertheless, as the summary judgment issues raised on appeal would arise on remand in the event that the district court

---

8. We stop short of addressing the question of whether striking Smith's counterclaims based on the discovery violation alone would be an abuse of discretion. We note, however, that district courts have wide discretion in such cases, *see Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957 ("[D]istrict courts are granted a great deal of deference in selecting discovery sanctions, and we overturn a sanction only in cases evidencing a clear abuse of discretion."), and that Utah courts have affirmed harsh sanctions for discovery violations in other cases, *see, e.g., First Fed. Sav. & Loan Ass'n of Salt Lake City v. Schamanek*, 684 P.2d 1257, 1266–67 (Utah 1984) (upholding a decision to strike pleadings where the defendant claimed the requested information was privileged but failed to establish that a privilege applied); *Wright v. Wright*, 941 P.2d 646, 647, 650 (Utah Ct. App. 1997) (affirming a court's decision to strike wife's answer and counter-petition in a divorce proceeding based on her failure to respond to discovery requests even though her counsel had withdrawn).

reinstates its sanctions order based on appropriate findings, we elect to address those issues here.

¶38     Smith argues that the district court erred in entering judgment in favor of CMP on its breach-of-contract claims and in granting the third-party shareholders' summary judgment motion, because its default findings did not establish all the elements of breach of contract. To establish a prima facie case for breach of contract, a plaintiff must establish "(1) a contract, (2) *performance by the party seeking recovery*, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, LLC*, 2001 UT 20, ¶ 14, 20 P.3d 388 (emphasis added) (quotation simplified), *abrogated on other grounds as recognized by A.S. v. R.S.*, 2017 UT 77, 416 P.3d 465. Smith asserts that the district court's default findings did not include a finding that CMP had performed under the contracts and that the court's summary judgment ruling was therefore erroneous.

¶39     "Generally, when a trial court fails to make factual findings on a material issue, such failure constitutes reversible error . . . ." *Uhrhahn Constr. & Design, Inc. v. Hopkins*, 2008 UT App 41, ¶ 29, 179 P.3d 808. Nevertheless, "missing findings can be viewed as harmless error" if "the undisputed evidence clearly establishes the factor or factors on which findings are missing" or "if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *Hall v. Hall*, 858 P.2d 1018, 1025 (Utah Ct. App. 1993) (quotation simplified).

¶40     The court found that Smith engaged in "discreditable acts as contemplated by" the Shareholders' Agreement; that CMP "followed the exact protocol contemplated by" the Employment Agreement in terminating Smith; that "Smith's conduct, both before and after his termination, breached his obligations under the Shareholders' Agreement"; and that "Smith's conduct after

his termination breached his obligations under the Employment Agreement." We agree with CMP that the default findings can be construed as determining that CMP did not breach the Employment Agreement; however, they cannot be construed as determining that CMP did not breach the Shareholders' Agreement.

¶41 With respect to the Employment Agreement, it can be inferred from the court's findings that CMP followed the appropriate protocol in terminating Smith and that CMP did not breach the Employment Agreement. Thus, such findings could adequately support a determination that CMP established its breach of contract claim on the Employment Agreement.[9] The non-compete sections of the Employment Agreement provide for an award of "liquidated damages in the amount of one hundred fifty percent (150%) of the billings by [CMP] to the clients during the 12-month period immediately preceding termination for those clients to whom Employee has rendered service subsequent to Employee's termination." Because the default findings support a ruling in favor of CMP on its claim for breach of the Employment Agreement, such findings could also support an award of liquidated damages.

¶42 With respect to the Shareholders' Agreement, Smith asserted in his pleadings that CMP and the individual shareholders violated the Shareholders' Agreement in January 2014 by reducing his shareholder distributions and salary, increasing the other shareholders' distributions, and refusing "to allow Smith to serve as a director." He also asserted that they

---

9. Smith does not appear to have actually asserted that CMP or the shareholders breached the Employment Agreement. Rather, his argument rested on his assertion that he was no longer subject to the Employment Agreement after the Shareholders' Agreement went into effect.

breached the Shareholders' Agreement by terminating his employment. While the district court's default findings stated that Smith violated the Shareholders' Agreement prior to his termination in July 2014, thus precluding his assertion that his termination was itself a breach of the agreement, it is not clear whether Smith's violations occurred prior to January 2014, and the district court made no findings regarding Smith's allegation that CMP and the shareholders breached the Shareholders' Agreement in January 2014. Thus, the default findings could not establish that CMP or the individual shareholders performed under the Shareholders' Agreement. Without such a determination, the court could not rule in favor of CMP on its claim for breach of the Shareholders' Agreement. Likewise, these findings could not resolve Smith's third-party complaint against the individual shareholders, which also rested on his assertion that they had breached the Shareholders' Agreement in January 2014.

## IV. Fees on Appeal

¶43    CMP has requested an award of fees on appeal. "[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Brown v. Richards*, 840 P.2d 143, 156 (Utah Ct. App. 1992). Because we must reverse the court's sanctions and summary judgment on the basis that its contempt order was plainly erroneous, CMP has not prevailed on appeal, and its request for fees is therefore denied.

## CONCLUSION

¶44    Though the district court did not exceed its discretion in holding Smith in contempt for violating the court's discovery order, the district court plainly erred in interpreting the language of its own preliminary injunction order and did exceed its discretion in holding Smith in contempt for violating that

order solely based on a finding that he worked for former clients. Because we cannot say whether the district court would have imposed the same sanctions based only on the discovery violation, we reverse the district court's ruling in favor of CMP and remand for further proceedings consistent with this opinion.

_____