**2024 UT App 133**

# THE UTAH COURT OF APPEALS

BOUNTIFUL CITY,
Appellant,
*v.*
ROBERT TAKASHI SWENSON,
Appellee.

Opinion
No. 20230430-CA
Filed September 19, 2024

Second District Court, Bountiful Department
The Honorable David J. Williams
No. 221800355

Peter Daines, Attorney for Appellant

Raymond Takashi Swenson, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

HARRIS, Judge:

¶1     Robert Takashi Swenson attended a doctor's appointment for his nine-year-old son (Son). At the time, Swenson was subject to a protective order that had been entered against him in favor of his ex-wife, who also attended the appointment. About a month later, Bountiful City (the City) charged Swenson with violating that protective order by attending the appointment. At a subsequent preliminary hearing, however, the district court declined to bind the matter over for trial, concluding that the terms of the protective order did not bar Swenson from attending the appointment and that there was therefore no probable cause to believe that Swenson had committed the charged crime. The City appeals from that determination, and we affirm.

BACKGROUND

¶2      Swenson and his ex-wife (Brooke[1]) married in 2008 and had two children, including Son, who was born in 2013. By 2015, however, the relationship had soured, and that year Brooke filed both a petition for divorce as well as a petition for a protective order. In November 2015, Brooke's request for a protective order was granted, and that order subjected Swenson to the following relevant commands:

- "**Personal Conduct Order** Do not commit, try to commit or threaten to commit any form of violence against [Brooke] or any person listed on page 1 of this form. This includes stalking, harassing, threatening, physically hurting, or causing any other form of abuse."

- "**No Contact Order** Do not contact, phone, mail, e-mail, or communicate in any way with [Brooke], either directly or indirectly."

- "**Stay Away Order** Stay away from [Brooke's] current or future vehicle, job, [and] home, [as well as t]he school or childcare of [the parties' children]."

The protective order did not, however, contain any provision—such as a 100-foot radius proximity order—specifically barring Swenson from being in physical proximity to Brooke.

¶3      The next year, in 2016, Swenson and Brooke agreed to amend and replace the "no contact" and "stay away" provisions of the protective order, as follows:

- "**No Contact Order (Replaces Paragraph 2 of the Protective Order).** *Communication* between the Parties

---

1. A pseudonym.

shall be limited to email. Each party may set up a new email account for this *communication*. All *communication* shall be civil and in a reasonable number to solve the problem. *Communication* shall be limited to the Minor Children's health, education, welfare, and parent-time. Any *communication* regarding a medical emergency for Minor Children can be by phone. Parties shall keep each other apprised of their address and telephone number." (Emphasis added.)

- **"Stay Away Order (Replaces Paragraph 4 of the Protective Order).** [Swenson] shall stay away from [Brooke's] current or future vehicle, job, and home, except to accommodate parent-time exchanges. Parent-time exchanges shall be curbside. Parties shall have no contact except for exchange of clothing and other items for their minor children."

¶4 The next year—in 2017—the parties reached a stipulation by which they agreed to resolve all of the issues in their divorce case, and they submitted an agreed-upon form of divorce decree (Decree) to the court for signature. As relevant here, the Decree provides that "[b]oth Parties may attend Minor Children's events without regard to which parent is entitled to parent-time during the events," and that "[i]f there is a conflict between the Protective Order and [the Decree], [the Decree] prevails, and Parties will cooperate to amend the Protective Order so that it is consistent with [the Decree]."

¶5 Over the next few years, Swenson and Brooke simultaneously—although not together—attended many of their children's events, including back-to-school events, graduations, parent-teacher conferences, school plays and performances, PTA events, karate-belt-promotion tests, and religious events (e.g., baptisms). On occasion, at least in the years immediately following entry of the Decree, Swenson and Brooke even

concurrently attended a number of medical appointments for their children, including occasions where the two of them were, for a time, in the same room.

¶6     But by about 2021, Brooke informed Swenson that she did not want him to attend any medical appointments at which she was present. And, for a time, the parties proceeded in this manner, with only one of them attending medical appointments.

¶7     In August 2022, however, Swenson wanted to attend a particular appointment for Son that Brooke was also attending. Brooke did not want him to attend, and as the hour of the appointment approached, she informed him via email that if he chose to attend, she would take the position that "it will be a violation of the protective order." Swenson responded that this would "[p]ossibly" be the case, but he stated that he intended to attend anyway and that he was "walking inside now."

¶8     According to Swenson—whose account is the only one we have in the record submitted to us—the appointment took place entirely without incident. Both Swenson and Brooke communicated with the physician about Son, but there is no indication that they communicated at all with each other, verbally or otherwise. And there is no indication that there was any physical contact between them. After the appointment, Brooke notified police that Swenson had been present at the appointment.

¶9     About a month later, the City charged Swenson with one count of violation of a protective order. As that case proceeded, Brooke filed a motion in the protective order case—a case presided over by the same judge who was presiding over the criminal case—asking the court to modify the terms of the protective order to include a provision requiring Swenson to stay 500 feet away from Brooke. The court held an evidentiary hearing to consider the matter, and it thereafter determined that Swenson's attendance at the doctor's appointment in question

had not violated the terms of the protective order, and in addition declined Brooke's invitation to add a term to the order that would expressly bar Swenson from ever being within a minimum distance from Brooke.

¶10 A few weeks after holding the evidentiary hearing in the protective order case, the court in the criminal case held a preliminary hearing to consider whether that matter should be bound over for trial. At that hearing, the parties agreed that the operative facts were not in dispute—everyone agreed that Swenson had been present at the doctor's appointment and had known that Brooke would be there—and that the main issue in dispute was whether the terms of the protective order forbade Swenson from being there. Because the facts weren't in dispute, the parties agreed to proceed by "argument and proffer" rather than by presenting live testimony.

¶11 The City proffered the facts as set forth above—including that Swenson had been present at the appointment and knew in advance that Brooke would be there—but it proffered no evidence that Swenson had said anything to or made any other effort to communicate, either directly or indirectly, with Brooke during the appointment. And both sides offered oral argument about the meaning of the language of the protective order. The City argued that the parties' recent course of conduct—generally attending medical appointments separately during the year before the appointment in question—indicated that the parties understood that the protective order barred Swenson from being present at such appointments if Brooke was also present. And it asserted that interpreting "the no-contact provision in a way that does not include physical contact but only addresses verbal contact would be an interpretation contrary to common understanding . . . ." In response, Swenson countered that the City had a burden "to prove that [he] clearly violated the explicit terms of the protective order," and he pointed out that no provision "in the protective order . . . says [he] must stay [away] from [Brooke] personally."

¶12 At the conclusion of the hearing, the court again interpreted the protective order in Swenson's favor, concluding that "there's nothing in the protective order that prohibits the attendance of Mr. Swenson at doctor's appointments." The court began its analysis by examining the protective order and by noting that, in this criminal case, "it is of the utmost importance that the provisions of the protective order clearly state what is prohibited so that [Swenson] is on clear notice regarding . . . what he . . . can or cannot do." The court also noted that the protective order contained no "distance requirement" that barred Swenson from being within a certain distance of Brooke at all times, and that the court had recently denied Brooke's request to modify the protective order to add such a requirement. In the court's view, the "no contact" provision of the order was largely aimed at restricting the parties' communication with one another, but it could perhaps be interpreted "that you cannot have physical contact." The court declined the City's invitation to read into the "no contact" provision a prohibition on Swenson ever being in the same room as Brooke. And the court noted that there was no "evidence of a physical contact during the" appointment, and no evidence that Swenson had been inappropriately near Brooke's "vehicle, job, or home." For these reasons, the court did "not find probable cause to bind this case over," and it therefore ordered the case dismissed.

ISSUE AND STANDARD OF REVIEW

¶13 The City now appeals the court's order dismissing the case for lack of probable cause. A district court's bindover decision involves "mixed questions of law and fact to which we grant some deference." *State v. Schmidt*, 2015 UT 65, ¶ 13, 356 P.3d 1204 (quotation simplified). "In this context, appellate courts give limited deference to a magistrate's application of the bindover standard to the facts of each case." *State v. Prisbrey*, 2020 UT App 172, ¶ 18, 479 P.3d 1126 (quotation simplified).

ANALYSIS

¶14    "To support the bindover of a defendant for trial, the prosecution must put forward enough evidence at the preliminary hearing to establish probable cause." *State v. Graham*, 2013 UT App 109, ¶ 8, 302 P.3d 824. In this context, "all evidence and testimony must be viewed in the light most favorable to the [prosecution], and all reasonable inferences are drawn in favor of the [prosecution]." *State v. Smith*, 2024 UT 13, ¶ 32, 548 P.3d 874. As we have often stated, the prosecution's "burden is relatively low." *Prisbrey*, 2020 UT App 172, ¶ 21 (quotation simplified). But that low burden does not guarantee bindover; courts should deny bindover when the prosecution does not "present sufficient evidence to support a reasonable belief that an offense has been committed and that the defendant committed it." *Id.* ¶ 20 (quotation simplified); *accord Schmidt*, 2015 UT 65, ¶¶ 21–22.

¶15    In this case, the City charged Swenson with violation of a protective order, a crime that requires the City to prove that Swenson "intentionally or knowingly violate[d]" the terms of a protective order with which he had "been properly served . . . ." *See* Utah Code § 76-5-108(2)(b). In this case, the parties agree that there exists a valid protective order and that Swenson was properly served with it. In addition, the parties agree that Swenson was intentionally present at the doctor's appointment and that he knew in advance that Brooke would be there.

¶16    With all of those things undisputed, this case therefore involves a relatively narrow question: whether the district court abused its limited discretion in concluding that Swenson's uncontested actions could not constitute an intentional or knowing violation of the terms of the protective order.

¶17    As an initial matter, we agree with the district court's observation that, in this criminal case in which Swenson faces the potential of incarceration, "it is of the utmost importance that the

provisions of the protective order clearly state what is prohibited so that [Swenson] is on clear notice regarding . . . what he . . . can or cannot do." Indeed, individuals cannot be punished for disobeying a court order unless the order is "sufficiently specific and definite as to leave no reasonable basis for doubt regarding its meaning." *See Cook Martin Poulson PC v. Smith*, 2020 UT App 57, ¶ 26, 464 P.3d 541 (quotation simplified).[2] And in the related and analogous contempt context, courts have often declined to punish individuals accused of violating a court order where the order in question is not sufficiently clear to put the individual on notice regarding what is required. *See, e.g.*, *id.* ("Contradictory language in the findings and conclusions is simply not 'sufficiently specific and definite' . . . . This should have been obvious to the district court, and therefore, it was plain error for the court to find Smith in contempt for violating the preliminary injunction solely on the basis that Smith provided services to former clients."); *see also Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 111, 507 P.3d 385 ("We could not say that the language is so clearly limited . . . that there could be no reasonable basis for doubt regarding its meaning." (quotation simplified)), *cert. denied*, 525 P.3d 1259 (Utah 2022); *State v. L.A.*, 2010 UT App 356, ¶ 18, 245 P.3d 213 ("Under these circumstances, the juvenile court's contempt order was not supported by sufficient evidence that [the parent] knew what was required." (quotation simplified)).

¶18 On the other hand, where the order in question is clear, it is appropriate to punish individuals who intentionally or knowingly violate it. *See State v. Fouse*, 2014 UT App 29, ¶ 38, 319 P.3d 778 ("This was a clear violation of the provision in the protective order requiring [the defendant] to stay away from the

---

2. A somewhat similar concept is the so-called "rule of lenity," which "requires that we interpret an ambiguous statute in favor of lenity toward the person charged with criminal wrongdoing." *State v. Rasabout*, 2015 UT 72, ¶ 22, 356 P.3d 1258.

premises or the provision precluding him from contacting [the victim], even indirectly." (quotation simplified)); *see also State v. Pence*, 2018 UT App 198, ¶ 23, 437 P.3d 475 ("We disagree with [the defendant's] argument that 'ordinary people' would not know 'what conduct is prohibited' by the 'Stay Away' language used in the protective order. Any ordinary person would know that a protective order directing a party to 'Stay Away' from someone or something means to avoid all contact with that person or thing." (quotation simplified)).

¶19   We agree with the district court's assessment that the protective order at issue here did not clearly prohibit Swenson from attending medical appointments for his children, even when Brooke was also present. No provision of that order barred Swenson from being within a certain distance from Brooke, and no provision of that order barred Swenson from attending Son's medical appointments.

¶20   Despite the absence of any language clearly forbidding Swenson from attending the appointment, the City asserts that the "no contact" and "stay away" provisions of the protective order are broad enough to put Swenson on notice that he should not have attended an event that would put him in the "same enclosed space" as Brooke, or in her "immediate proximity." The City's assertions are unpersuasive. In some cases, protective orders are drafted to include a physical proximity provision that forbids the respondent from being within a certain distance from the petitioner. This order had no such provision, and its absence must mean something; indeed, the district court declined Brooke's express invitation to add such a provision. As drafted and enacted, the "stay away" provision only commanded Swenson, as a general matter, to stay away from Brooke's vehicle, home, and workplace, and from the children's school. It said nothing about the children's medical appointments.

¶21 And the "no contact" provision is—as drafted and amended by these parties—all about the parties' *communication* practices, and not about actual physical contact. The meaning of a word is often illuminated by the words that surround it, especially if that word is just one word in a longer list. *See Richards v. Cox*, 2019 UT 57, ¶ 34, 450 P.3d 1074 ("[W]e read associated words as bearing similar contextual meanings to each other."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (explaining that "words grouped in a list should be given related meanings" (quotation simplified)). Here, the relevant provision of the original protective order commands Swenson not to "contact, phone, mail, e-mail, or communicate in any way with" Brooke. This list of terms is all about communication. In addition, the parties amended this provision in 2016, about a year after the order was entered, and they again chose words that all refer to various ways in which Swenson might communicate with Brooke; indeed, the parties used some form of the word "communicate" five times in one paragraph. Our best reading of this provision, especially as amended, is that it is intended to refer to communication, and not to physical contact.[3] At a minimum, the provision does not refer

---

3. The City resists this conclusion by directing our attention to out-of-state cases involving sex offenders whose probation conditions require them to have "no contact" with minors; courts in some such cases have interpreted the "no contact" language in that context to forbid "close proximity to a child," even in the absence of any communication. *See, e.g.*, *People v. Devorss*, 277 P.3d 829, 836 (Colo. App. 2011). We find these cases unpersuasive here, for two reasons. First, the sex offender context raises concerns about child safety that are not present in this case; indeed, these parties—as coparents of children—necessarily had to sometimes be at the same place at the same time, and they attempted to account for that in drafting the language of the order and the Decree. Second,

(continued…)

to physical contact clearly enough to allow it to be used as a vehicle for charging Swenson with criminal liability simply for being in Brooke's immediate proximity.

¶22    Our interpretation of the "no contact" provision is also informed by the parties' stipulated Decree, which expressly allowed Swenson to be present at the children's "events," even if Brooke was also there, and which mandated that, to the extent its terms were in conflict with the protective order, the Decree's provisions would control. In this vein, we also note the parties' practice, occurring over a number of years, of both attending various events without incident or complaint.

¶23    We can, to be sure, envision situations in which—given the proper context—a person's mere physical presence might be a subtle form of communication, or perhaps even a threat. And the protective order bars even nonverbal types of communication, as well as indirect communication. But here, the City presented no evidence that Swenson intended his presence at Son's appointment to be a form of communication, or even that Swenson knew that Brooke would take his presence that way. And the City presented no evidence that Swenson made any effort to communicate—even indirectly or nonverbally—with Brooke during the appointment. Had the City presented such evidence, this case might well look different.[4]

---

those cases are unpersuasive on a linguistic level; the "no contact" provision in this case, as amended, was all about communication and not about physical proximity.

4. In other cases cited by the City, the activity in question was at least arguably communicative. *See State v. Fouse*, 2014 UT App 29, ¶¶ 3, 7, 38, 319 P.3d 778 (a case in which the defendant sent letters and wedding memorabilia to the address where the protected

(continued…)

¶24   Under the circumstances of this case, however, the district court did not abuse its limited discretion by determining that the protective order was not clear enough to support criminal liability against Swenson.

## CONCLUSION

¶25   Because the protective order did not clearly forbid Swenson from attending Son's doctor's appointment, and because there is no evidence that Swenson made any effort to communicate with Brooke during that appointment, the district court did not abuse its limited discretion in concluding that no probable cause exists in this case to believe that Swenson committed the charged crime. We therefore affirm the district court's decision not to bind the case over for trial, and we affirm its order dismissing the case.

———————

person lived); *State v. Peterson*, 2008 UT App 137U, paras. 1–2 (a case in which the defendant sent "Valentine's Day cards and a rose" to the protected person); *State v. Hardy*, 2002 UT App 244, ¶¶ 3, 10–12, 54 P.3d 645 (a case in which the defendant sent letters, addressed to the parties' children, to the protected person's home, and two of the children were not even old enough to read). These cases are distinguishable on that basis.