2022 UT App 28

# THE UTAH COURT OF APPEALS

H. CANDI WADSWORTH,
Appellant,
*v.*
GUY L. WADSWORTH,
Appellee.

Amended Opinion[1]
No. 20190106-CA
No. 20200430-CA
Filed March 3, 2022

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 104904966

Michael D. Zimmerman, Troy L. Booher, and Julie J.
Nelson, Attorneys for Appellant

Clark W. Sessions, T. Mickell Jimenez, Marcy G.
Glenn, and Kristina R. Van Bockern, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN M. HARRIS and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1      This appeal arises from the divorce and division of the
marital estate belonging to H. Candi Wadsworth and Guy L.

---

1. This Amended Opinion replaces the Opinion issued January
13, 2022, *Wadsworth v. Wadsworth*, 2022 UT App 5. Paragraphs 6,
76, and 83 and footnote 14 have been revised in response to the
parties' petitions for rehearing.

Wadsworth. Candi[2] challenges various aspects of the district court's marital property valuation, its decision to defer the payment of her share of the marital estate, its award of alimony, and various other findings and orders. Guy cross-appeals, raising challenges relating to terms of the deferred payment and the alimony award. In a separate appeal, Candi also challenges the district court's decision not to grant her a security interest in her portion of the marital estate, which she will not receive in full until December 31, 2024. Because that issue is intertwined with various issues raised in the first appeal, we address both appeals in this consolidated opinion.

¶2    We remand for the district court to add certain notes receivable to the value of the marital estate, to adjust its alimony award to account for Candi's tax burden, to clarify its decision on whether security is required for the alimony award, and to grant Candi a security interest in her portion of the marital estate. We otherwise affirm the district court's decision.

## BACKGROUND

¶3    Candi and Guy married in 1979. Guy started Wadsworth Brothers Construction (WBC) in 1991, and over the years, it grew into a multimillion-dollar company. The parties also have interests in numerous other business entities, including two restaurants, a hotel, and various real estate holdings.

¶4    In 2009, Candi filed for divorce, suspecting that Guy was involved in an extramarital affair. Guy denied the infidelity, and the couple reconciled. However, a year later, Guy confessed to an affair, and Candi again filed for divorce.

---

2. As is our practice, because the parties share the same last name, we refer to each by their first name, with no disrespect intended by the apparent informality.

*Pre-Divorce Proceedings and Temporary Orders*

¶5 During the period between these two divorce filings, Guy purchased two restaurants, a plane, a cabin, and a yacht. He did not discuss any of these purchases with Candi, and she learned about them from other people. The yacht cost $2,502,800, but by the time of trial, the yacht was under water—Guy still owed $1,175,399, but the yacht was worth only $790,500.

¶6 Without consulting Candi, Guy also assigned fractional shares of various marital entities to the Wadsworth Children's 2007 Irrevocable Trust (the Trust) in 2009. Although Guy had created the Trust two years before, he had originally funded it with only $10. By the time of trial in 2017, the fractional shares held by the Trust were worth approximately $4 million.

¶7 While the divorce was pending, Guy maintained control of the marital estate, apart from $1 million and two interest-generating accounts that he transferred to Candi early in the proceedings. In February 2012, the district court adopted the parties' stipulation regarding temporary orders (the Stipulation) stating that, on a temporary basis, Guy "shall pay all of the children's expenses as he has in the past as well as all of [Candi's] expenses as he has in the past." Because Guy was paying these expenses, he was not ordered to pay temporary child support or alimony at that time. The Stipulation also addressed the use of marital assets during the pendency of the divorce proceedings:

> 1. Based upon the parties' stipulation, [Guy] shall maintain, in the regular course of business, the management and control of [WBC], as he has in the past.

> 2. Based upon the parties' stipulation, neither party shall sell, gift, transfer, dissipate, encumber, secrete or dispose of marital assets other than in the course of their normal living expenditures, ordinary and

necessary business expenses and to pay divorce attorneys and expert fees and costs. [Guy] shall have the right to conduct the business hereinabove identified as he has in the past, which may include incurring debt, paying expenses and acquiring assets.

¶8 During the divorce proceedings, Candi asked the court to hold Guy in contempt based on alleged violations of the Stipulation. She asserted that he made numerous financial transactions that violated the Stipulation, including selling his home, buying a new home, selling a hotel, creating a new business entity and loaning it money, investing money in a property development company (FDFM), purchasing a jet to "flip," and making an "undisclosed sale" of $697,448.72. The court accepted Guy's and his estate planning attorney's testimonies that "Guy had a history of setting up different corporate entities for liability protection purposes" and that he "did not create any entity or transfer any asset with the intention of hiding it from Candi." The court found that "the transactions Candi complains of were consistent with Guy's historical practice of transferring assets from one entity to another or from one form into another" and that those actions fell within the Stipulation's condition permitting Guy "to conduct the business hereinabove identified as he has in the past, which may include incurring debt, paying expenses and acquiring assets." The court also found that "[t]here is no indication that these transactions were out of the ordinary or done with the intent to hide assets."

¶9 In September 2014, Guy sought to modify the Stipulation, explaining that the parties' last child had reached majority, that he had paid off the mortgage on Candi's house, and that he had purchased Candi a new vehicle, thereby eliminating many of her expenses. Guy asked the court to modify its order to require him to pay Candi $20,000 per month rather than all her expenses without limit. Following a hearing in January 2015, the court ordered that Guy pay Candi $20,000 per month in temporary alimony. It also ordered that Candi "keep an accounting of how

the money is spent if she desires more funds." During the first month following the order, Candi exceeded the $20,000 budget and "she had to repay Guy for amounts she had previously spent as well as cancel planned travel with the children." In April 2015, the court issued a written order in which it clarified that Guy should "reimburse" Candi "as to any payments beyond the $20,000" unless he could show it was "an inappropriate or excessive expense." Candi never requested additional funds from Guy after the court issued the written April 2015 order. She claims this was because she elected to curtail her spending rather than ask Guy for extra money; she maintains that she did not believe he would comply with her requests and she did not want to incur more attorney fees to collect the money. During this period, Guy was spending approximately $60,000 per month.

¶10     Guy represented that Candi continued to have access to the parties' boats and planes, a cabin, free dining at the restaurants, and a country club and other exclusive resorts for which Guy continued to pay the membership fees. However, to use the planes and boats, Guy expected Candi to pay for the cost of the pilot, captain, and other expenses out of her $20,000 monthly funds. Candi did not do so because she understood the cost to be between $5,000 and $10,000 per trip. Candi also alleged that Guy refused a number of requests she made to use the parties' shared assets.

*Procedural History of the Divorce*

¶11     The parties spent more than six years conducting discovery and other pretrial litigation before the matter finally came before the district court for an eight-day bench trial in February 2017. The court held a second four-day trial in May 2017 concerning Candi's attempt to revoke the Trust. *See infra* ¶ 25.

¶12     The court issued a Memorandum Decision, Findings of Fact and Conclusions of Law in September 2017 (the 2017 Findings). Subsequently, Candi filed a Motion to Clarify, and

both parties also filed Motions to Amend. The court issued an order addressing those motions in May 2018 (the May 2018 Order). In response to that order, both parties filed additional Motions to Amend, which the district court ruled on in a Memorandum Decision and Order in October 2018 (the October 2018 Order). The court then directed Guy to prepare supplemental findings of fact to incorporate the various rulings encapsulated in the May 2018 Order and the October 2018 Order.

¶13    Following the October 2018 Order, Guy filed an Ex Parte Motion for Expedited Entry of Decree of Divorce. Guy pointed out that new federal tax law would change how alimony was taxed for any divorce decrees entered on or after January 1, 2019. Instead of alimony being taxable to the payee spouse and deductible to the payor spouse, alimony would become taxable to the payor and deductible to the payee. Since the trial had occurred and the 2017 Findings had been entered over a year before, "predicated on the application of the existing divorce laws," Guy asserted that it would be inequitable to enter the divorce decree after December 31, 2018. Although the court indicated that it believed "both parties are to blame" for the delays in finalizing the decree, it ultimately did enter Supplemental Findings of Fact and Conclusions of Law (the 2018 Supplemental Findings), as well as the Decree of Divorce, on December 31, 2018.

¶14    The parties then filed a third set of cross-motions to amend the findings and conclusions, and the court held a hearing on those motions in early 2019. The court entered a Memorandum Decision and Order in May 2019, which it subsequently amended in June 2019 (the 2019 Order). The court directed Candi to prepare corrected Supplemental Findings of Fact and Conclusions of Law and a Supplemental Decree of Divorce. The court entered the Amended Supplemental Findings of Fact and Conclusions of Law (the 2019 Supplemental Findings) and the Amended Decree of Divorce on October 30, 2019.

*Expert Valuation of Marital Property*

¶15 Both parties hired experts to value the various business entities. Three aspects of that valuation and the district court's findings are relevant on appeal: notes receivable, WBC's backlog, and WBC's equipment.

*Notes Receivable*

¶16 The balance sheets for three of the entities owned by Guy included in their accounting of liabilities loans that they owed to Guy—Immobiliare II, Ltd. owed Guy $252,861; Five Diamond Hospitality, Inc. owed Guy $706,605; and FDFM owed Guy $100,000. These liabilities were considered in the court's final calculation of these entities' value. However, the notes receivable on these loans—which belonged to Guy—were not counted as marital assets.

¶17 The court made no mention of the notes receivable in its 2017 Findings. Candi raised this matter in her Motion to Clarify. Candi asked the court to add the value of the notes receivable to the value of the estate. In response, Guy did not assert that the notes had been included but nevertheless resisted their inclusion as part of the marital estate, arguing that Candi had not made the "request at trial and did not enter evidence of where the funds remain and in which entities or whether the funds are being used for business purposes." The court found that "[t]he parties agree that the Court did not consider the three notes receivable" but observed that "[n]either party points to the record regarding this issue." The court did not adjust its valuation of the estate based on the notes.

¶18 Subsequently, Candi filed her second motion to amend, in which she again raised the matter of the notes receivable, among other things. In the October 2018 Order, the court found that Candi "does not show that those notes were not considered in the company valuations" and that it had "already addressed her argument" in the previous order. Guy was then asked to prepare

supplemental findings based on the court's order, and that version of the findings stated that "all Notes Receivable were included in the valuation of the various marital entities by the parties' experts."

*WBC's Backlog*

¶19    As of June 30, 2016, WBC had a backlog of work—construction contracts that had been signed but for which the work had yet to be completed—amounting to an estimated value of approximately $75 million. Guy testified that WBC's profit margin on such projects was typically between 5% and 7%. Candi's expert estimated the projected net profit on the backlog to be $3,441,733. Guy's expert estimated that the projects would realize a gross profit of $4,676,347, but he also opined that the backlog ultimately had "no value" because "the backlog in its current state" was not sufficient to sustain the company and could therefore be expected to start "absorb[ing] cash flow." Guy also testified that WBC had struggled to make a profit since the recession and had to lay off workers and use capital to continue operating. He testified that WBC had failed to get some large contracts it was hoping for and that its backlog was less than in past years. Another witness, who advises large companies on marketing and selling their businesses, testified that "marketability" and "valuation methodologies" are "all centered around current backlog." He explained that "in a construction company, they're only as good as the backlog in front of them."

¶20    The court found that "the value of the projected backlog profit is $4 million." However, the court adopted Guy's expert's valuation of WBC, which had assigned the backlog no independent value. The parties addressed the inconsistency in their motions to amend. Candi asked the court to adjust the overall valuation of WBC upward by $4 million to reflect its finding that the backlog profit was worth $4 million. Guy asked the court to change its finding that the backlog was worth $4 million to conform to its adoption of his expert's valuation of the company, which assigned the backlog no value. In its May 2018

Order, the court found that Guy's expert had "testified the backlog had no value to a potential buyer, and the Court adopted his valuation of WBC." It also found that the other witness had testified that "any potential purchaser would not purchase the company based on a backlog." Finally, it found that "Candi did not provide counter-testimony to" the "statements of no value in the backlog." Accordingly, it concluded that "[t]he evidence supports that the backlog has no value in the valuation of the company" and amended its decision to state that "the backlog has no value." These amended findings were incorporated into the 2018 Supplemental Findings.

*WBC's Equipment*

¶21   Both parties hired experts to assess the value of WBC's equipment. Guy's expert had worked in the construction industry for twenty-five years and had been an appraiser for Ritchie Brothers Auctioneers for four years. To value the equipment, the expert used "internal standards that [Ritchie Brothers] has developed over time and experience" based on "historical auctions, personal experiences of appraisers, and knowledge of the world's economic conditions." Guy's expert testified that Ritchie Brothers' "business is derived primarily from stable operators exchanging equipment and updating equipment inventories in the normal course of business," rather than wholesalers trying to resell and make additional profit, and that "80 percent of [their] sales . . . represent fair market value." Guy's expert and his team "personally inspected nearly all the pieces of equipment at issue"; "[t]hey turned on the machines, checked the miles and hours and verified the [vehicle identification numbers]." They appraised 569 items and estimated that "the entire package of equipment . . . would sell at unreserved public auction in the range of $13,890,300."

¶22   Candi's expert is a member of the American Society of Appraisers and is an Accredited Senior Appraiser. He conducts appraisals based on the Uniform Standards of Professional Appraisal Practice (USPAP). He testified that "he evaluated the

equipment at the fair market value of a 'going concern' business" and that he believed using "auction values" was more appropriate for a business that was trying to liquidate its inventory. Candi's expert received a list of approximately 400 pieces of equipment with the make, model, description, and serial number. He "did not closely inspect each piece of equipment," "did not start any of the equipment, did not look at the mileage or hours logged, and did not consider the condition of each piece." He "took photos of the equipment and researched the values by contacting manufacturers, contractors, and dealers; consulting other sales [online]; and considering his prior appraisals and experience." Ultimately, Candi's expert valued the equipment at $22,499,255.

¶23 The court found that the method used by Guy's expert was "more accurate" and that his team was "more thorough in assessing the individual pieces of equipment." The court rejected Candi's assertion that selling equipment at "an auction house has the same connotation as a fire sale," relying on the expert's testimony that end users regularly buy heavy construction equipment at auction. It therefore adopted Guy's expert's $13,890,300 valuation of the equipment.

*Dissipation*

¶24 Candi argued to the district court that Guy had dissipated marital assets in anticipation of divorce, including spending money on his girlfriend; purchasing the yacht, a jet, and a wine collection; paying attorney fees for the Trust; and transferring money out of the estate into the Trust. Except as to $814,000 Guy spent on his girlfriend, for which it compensated Candi out of the marital estate, the court found that "Guy did not dissipate marital assets." Although the court found that the legal fees spent on the Trust were not dissipation, it nevertheless allocated half of that value to Candi as part of the marital estate. As to the purchase of the yacht, jet, and wine, the court reasoned that Guy did not dissipate assets by purchasing these items because the items were still in the marital estate, and Candi was awarded

half their value. The court also found that "[i]t was Guy's historical practice to buy planes and boats" and that "[s]ome depreciation of" such assets "is to be expected." The court rejected Candi's argument that purchasing a depreciating asset should, as a rule, be considered dissipation. However, the court assigned the negative value on the yacht entirely to Guy, reasoning that he "unilaterally purchased this boat" and limited Candi's access.

¶25 The parties engaged in extensive litigation regarding the Trust, even going through a separate trial to address the validity of the transfers and to consider Candi's attempt to revoke the Trust. However, the court ultimately determined that "the Trust was validly created," that the parties intended for it to be irrevocable, that the creation and funding of the Trust was "in line with the parties' history of gifting assets to the children as part of their wealth management and estate planning strategy," that "there is no evidence that Guy was motivated by a desire to divest Candi of marital assets," and that the transfers were completed before Candi filed for divorce so that the Trust property was not part of the marital estate or subject to division. Accordingly, the court rejected Candi's argument that Guy's transfer of assets into the Trust constituted dissipation.

¶26 Candi also took issue with Guy's investment in FDFM, an entity "created to develop land in [North] Dakota when the oil rush was booming." Although Guy's interest in FDFM by the time of trial was worth only $734,000, he had invested $1,129,000 into it. Candi asserted that the higher value should be used because Guy did not disclose the investment to her. The district court rejected this argument, explaining that Guy "never consulted with Candi on any business decisions that he made" throughout the marriage, so making business decisions without disclosing them to her was "well within the scope of his historical practices."

¶27 Candi also complained that Guy had used marital funds to pay his attorney fees and that his spending on fees had not

been credited to the marital estate. In examining the funds each party had already received, the court recognized that Candi had received $1,277,500 in marital funds to pay her attorney and expert fees and costs. The court also estimated, based on Guy's testimony, that Guy had spent approximately $800,000 in attorney and expert fees and costs. The court equalized these amounts in calculating the value of the marital estate.

*Division of the Estate and Equalization Payment*

¶28    The district court found that the total value of the marital estate was $43,886,329.85 and that each party should receive half of that value ($21,943,164.93). The court awarded Candi various liquid assets, real property, vehicles, retirement plans, investments, and other property totaling just over $4.7 million. It awarded the remainder of the marital property, including all interest in the parties' various businesses, to Guy and ordered Guy to pay Candi $17,238,018.02 to compensate her for the value of her portion of the estate. The court explained that "because of the overlapping entities and the numerous assets placed in various entities, it would be more appropriate to award Candi a sum of money constituting her share of the marital estate." The court found that "shared ownership of the companies" was not an option because "Candi does not have the business acumen necessary to know how to run these companies" and that it would be "a bad idea" for the parties to continue their relationship by operating the companies together, "especially given Candi's distrust of Guy." It also found that "[a] forced sale of marital business assets is not in the best interest of either party" because both parties benefit from "Guy's continued work for WBC and other businesses."

¶29    Although Candi had argued to the district court that she should be given ownership of the two restaurants to help offset the portion of the estate owed to her, the court rejected that request because it found that "her limited business experience would not help her in increasing the value of the business." In its May 2018 Order, the court further explained its refusal to award

the restaurants to Candi by observing that the restaurants had only just begun to be profitable due to Guy's careful management and that the restaurants were partially owned by a third party.

¶30 In the initial 2017 Findings, the court did not outline a method for Candi to receive her share of the marital estate. Candi proposed several options, including appointing a special master to oversee the distribution, transferring some of the assets to her directly, sharing ownership of the companies, or forcing a sale of some of the assets. The court rejected each of these proposals. Instead, in the 2018 Supplemental Findings, the court ordered Guy to pay the amount owed to Candi "in such equal monthly installments as he shall determine." Any remaining amount was to be paid in a balloon payment five years from the date of the entry of the Decree of Divorce, which made the final payment to Candi due December 31, 2023. The court also ordered that Guy pay 10% annual interest on the amount owed to Candi. Although Guy contested the high interest rate, the court justified it because the court had given him "substantial leeway in setting the payment schedule over the next five years." Because Guy would have "exclusive and full access to the marital assets," the court reasoned that the high interest rate would give him a necessary incentive to make the payments more quickly.

¶31 In subsequent motions, the parties continued to dispute the court's equalization order. Thus, in its 2019 Supplemental Findings, the court again modified the payment schedule. Guy was to pay Candi (1) $30,000 per month, to be applied first toward interest; (2) $500,000 per year, to be applied first toward interest; and (3) a balloon payment of the outstanding principal and interest by December 31, 2024.[3] The court also modified the

---

3. Because of the various objections to the payment plan, the court changed the commencement date from the date of the entry of the Decree of Divorce to the date of entry of the

(continued…)

interest rate to 5% per year. The court explained that the 10% interest rate "was appropriate" when the court had "deferred to Guy to come up with an appropriate payment plan" but that it was excessive once the court "determined the payment plan." Instead, the court set the interest rate at 5% and explained that rate was intended "to provide Guy with an incentive to pay the Equalizing Balance quickly."

¶32 After the court issued its ruling, Candi filed a motion asking the court to secure her unpaid share of the marital estate. She explained that security was necessary to "protect her from dissipation, economic uncertainties, or Guy's death." She also asked for an injunction ordering Guy "not to alienate, waste, dissipate, or diminish his share, ownership interest, or the value of the entities" without "Candi's express, prior, written permission." Candi proposed several methods for securing her interest, including attaching a UCC-1 lien to the assets of WBC or other marital entities or imposing other "conditions and covenants" on Guy and WBC. But she also explained that "there are a lot of different ways" to give her an effective security interest, including placing a lien on the restaurants, WBC's equipment, or Guy's interest in the businesses.

¶33 The court refused to grant Candi any security, reasoning that it could not award a lien against the businesses because "[t]he businesses were not parties to this suit," that the equalization payments were not subject to the Uniform Commercial Code because the division of the marital estate is not a commercial transaction, and that Guy was unable to obtain adequate life insurance to secure her interest due to his age and health. The court did not provide any further rationale for its

---

(…continued)
Amended Decree of Divorce and changed the balloon payment due date from December 31, 2023, to December 31, 2024. The court found the change to be appropriate because it could not "determine who has delayed the payment plan."

determination that no security was warranted or explain why other options for securing Candi's unpaid interest in the marital estate, such as a lien on Guy's personal interest in the businesses, could not be employed.

*Alimony*

¶34 In its 2017 Findings, the district court found that Candi testified "she had more than $20,000 in reasonable monthly expenses." However, the court found that Candi "could not testify as to specific details" and "did not prepare a financial declaration." Nevertheless, the court examined standard financial declaration items, Guy's financial declaration, a standard of living analysis of the parties' pre-separation spending prepared by one of Candi's experts, and Guy's record of the expenses he paid on Candi's behalf while the divorce was pending to reach a determination regarding Candi's monthly need. The court included numerous categories of expenses in its needs calculation and determined Candi's reasonable monthly expenses to be $27,693.90. However, the court did not include taxes in its assessment of Candi's needs, because Candi "failed to provide evidence of her tax liability at trial." The court imputed minimum wage income to Candi at $1,257 per month. The court subtracted the imputed income from Candi's reasonable monthly expenses to determine that her monthly need is $26,436.90.

¶35 The court found that Guy had a net income of $141,143 per month and reasonable monthly expenses of $50,138. Accordingly, it found that Guy easily had the ability to pay alimony in the amount of $26,436.90 per month to Candi. It ordered Guy to pay that amount of alimony for a length of time equal to the length of the marriage, effective as of the date of the 2017 Findings. Alimony was to terminate upon "the death of either party" or "remarriage or cohabitation by" Candi. The court also indicated that "Guy should provide a life insurance policy for Candi to cover alimony for a period of time sufficient to cover his obligation should he unexpectedly pass away."

¶36 While the parties' various motions were pending following the entry of the 2017 Findings, Guy represented that he was unable to get life insurance due to a health condition and asked the court to remove that requirement. The court denied Guy's request and found in the May 2018 Order,

> Although there was information regarding Guy's health, there was no information whether or not he could or could not obtain a life insurance policy. The Court wants to ensure that Candi will receive the money awarded should he pass unexpectedly. The parties may also work toward a mutually agreeable solution that will protect Candi and her ability to receive said money.

However, the 2018 Supplemental Findings, drafted by Guy, stated simply that "there was no information as to whether or not Guy could or could not obtain a life insurance policy for such purpose nor the cost thereof." Candi urged the court to be more specific by making its life insurance order mandatory and requiring Guy to provide an alternative means of security if he could not get life insurance. However, the court declined to do so, stating that "[t]he Court's ruling in the [May 2018 Order] is sufficient."

### ISSUES AND STANDARDS OF REVIEW

¶37 On appeal, Candi argues (1) that the operative dates of the Decree of Divorce should be adjusted or, alternatively, that the balloon payment should be due on December 31, 2023; (2) that she received unequal access to the marital estate while the divorce was pending and should be compensated for the inequality; (3) that the court erred in its valuation of the marital estate, namely, by failing to take into account the value of the notes receivable, undervaluing WBC's backlog and equipment, and not crediting the estate for Guy's alleged dissipation of

assets; (4) that the court erred in setting the terms of the marital estate division and refusing to grant her a security; (5) that the court should have included her tax burden in its calculation of her need for alimony purposes and required Guy to secure his alimony obligation with life insurance or by some other means; and (6) that the court exceeded its discretion by not holding Guy in contempt for violating the Stipulation.

¶38　For his part, Guy argues, on cross-appeal, (1) that the court set too high an interest rate on the balloon payment, (2) that the court should have required Candi to share in transaction costs that may be incurred if and when Guy liquidates assets to make the balloon payment, and (3) that the court should not have awarded any alimony to Candi at all.

¶39　The court's valuation of the marital property, the manner in which it distributed that property, and its alimony determination are all subject to the same standard of review. "In divorce actions, a district court is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (quotation simplified). "We can properly find abuse [of the district court's discretion] only if no reasonable person would take the view adopted by the [district] court." *Goggin v. Goggin*, 2013 UT 16, ¶ 26, 299 P.3d 1079 (quotation simplified).

> Accordingly, we will reverse only if (1) there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error; (2) the factual findings upon which the award was based are clearly erroneous; or (3) the party challenging the award shows that such a serious inequity has resulted as to manifest a clear abuse of discretion.

*Gardner*, 2019 UT 61, ¶ 18 (quotation simplified).

¶40   The court's decision whether to hold Guy in contempt is also entitled to deference. "The decision to hold a party in contempt of court rests within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court's action is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion." *Barton v. Barton*, 2001 UT App 199, ¶ 9, 29 P.3d 13 (quotation simplified).

ANALYSIS

I. Operative Dates

¶41   Candi first argues that the court should make the entire divorce decree effective on October 30, 2019, rather than December 31, 2018, since that was the date the court entered the final Amended Decree of Divorce. Alternatively, she asserts that the balloon payment should be due on December 31, 2023, consistent with the terms of the initial Decree of Divorce. However, Candi has not presented us with any substantive arguments in support of this contention. Her argument is essentially that it was unfair to put the Decree of Divorce into effect before the tax laws changed and yet delay the equalization payments until after the Amended Decree of Divorce was entered because both results "favored Guy." But the fact that a ruling favors one party or the other does not, by itself, make that ruling an abuse of the court's discretion. In fact, we cannot see any meaningful link between these two rulings—one concerns the effective date of the entire Decree, whereas one concerns the commencement of the payment plan.

¶42   Moreover, the district court had good reason for both decisions. As Guy pointed out in his Ex Parte Motion for Expedited Entry of Decree of Divorce, "[t]he trial of this matter, and the evidence submitted at trial and considered by the Court, were all predicated on the application of the existing divorce laws." Thus, entering the Decree of Divorce after the first of the year would have, no doubt,

spurred even more objections and additional hearings regarding alimony. Entering the Decree before the law changed was consistent with the parties' expectations throughout the divorce proceedings.

¶43   With respect to the equalization payments, the court's 2019 Supplemental Findings were drastically different from its 2018 Supplemental Findings. The 2018 Supplemental Findings left the equalization payment schedule in Guy's hands, whereas the 2019 Supplemental Findings required him to pay a specified monthly amount. Leaving the effective date for those payments on December 31, 2023, as outlined in the 2018 Supplemental Findings, would have required Guy to come up with the entire first year's payments all at once, as he was not required to make monthly or yearly payments under the 2018 Supplemental Findings. The court found it appropriate for the equalization payments to commence at the same time it issued its 2019 Supplemental Findings because it could not "determine who has delayed the payment plan" and it "believe[d] that both parties share the responsibility for the delay in this matter." Candi has not demonstrated that this was an abuse of the district court's discretion.

## II. Access to Marital Estate

¶44   Candi next asserts that the district court should have compensated her for "inequities [that] resulted from Guy's use of the marital estate" while the divorce was pending. Candi raises three arguments concerning the allegedly unequal access to the marital estate: (1) that Guy was ordered to pay her only $20,000 per month in temporary alimony while he continued to spend around $60,000 per month, (2) that she did not have equal access to the parties' tangible assets and funds while the divorce was pending, and (3) that Guy spent more on attorney fees out of the marital estate than the $800,000 found by the district court.

A.    Monthly Spending

¶45    First, Candi contends that it was unfair for the district court to grant her only $20,000 in temporary alimony while Guy had an income of more than $141,000 per month and was spending over $60,000 per month.

¶46    "Prior to the entry of a divorce decree, all property acquired by parties to a marriage is marital property, owned equally by each party." *Dahl v. Dahl*, 2015 UT 79, ¶ 126, 459 P.3d 276; *accord Brown v. Brown*, 2020 UT App 146, ¶ 23, 476 P.3d 554. "For this reason, it is improper to allow one spouse access to marital funds to pay for reasonable and ordinary living expenses while the divorce is pending, while denying the other spouse the same access." *Dahl*, 2015 UT 79, ¶ 126.

¶47    But this principle does not require that the parties account for every dollar spent out of the marital funds and reimburse one another for any disparity. Rather, it requires that each party have equal *access* to use marital funds and assets "to pay for reasonable and ordinary living expenses while the divorce is pending." *Id.* For this reason, *Dahl* and *Brown* are distinguishable from the case at hand. In *Dahl*, the district court had ordered the wife to repay $162,000 she had received from the husband to pay for her living expenses while the divorce was pending without requiring the husband to repay the marital funds he spent during that time. *Id.* ¶ 125. The supreme court held that this was an abuse of discretion because it "had the effect of allowing one spouse to use marital funds to pay for living expenses during the pendency of the divorce, while denying such use to the other spouse." *Id.* ¶ 129. In *Brown*, the district court ordered the husband to pay for the wife's "expenses insofar as they exceeded the income she earned plus amounts [he] advanced while the divorce was pending." *Brown*, 2020 UT App 146, ¶ 24. This court found that order to be appropriate because it gave the wife "the benefit of the marital estate to help cover [her] living expenses . . . up until the divorce decree was entered." *Id.* ¶¶ 27–28.

¶48    Here, the district court ordered Guy to "reimburse" Candi for reasonable monthly expenses "beyond $20,000" unless they were "inappropriate or excessive." And although Candi indicated that she voluntarily curtailed her spending to avoid fighting for reimbursement, she did not present any evidence that she incurred expenses in excess of the $20,000 Guy provided each month. Since the court ordered Guy to pay for reasonable expenses beyond $20,000, it established a mechanism for Candi to have continued access to the marital estate to pay for her living expenses. The fact that Candi found it too burdensome to request additional funds and was skeptical about Guy honoring her request does not mean she lacked meaningful access to the marital estate.[4] And the fact that Guy spent more each month than Candi does not, by itself, indicate that Candi lacked equal access to marital funds while the divorce was pending. Access is not the same as use. And we are aware of no principle requiring that district courts equalize the parties' *use* of marital assets during the pendency of a divorce as opposed to reimbursing a party for expenses they incurred as a result of unequal *access*.

B.    Tangible Assets

¶49    Our analysis of Candi's challenge to the unequal use of the parties' tangible assets is similar to our analysis of her unequal use of funds: she has not demonstrated that she had unequal access to the assets, as opposed to unequal use. It was certainly easier for Guy to use the assets, since they were in his control. And it is undisputed that Guy told Candi she would have to pay the expensive costs associated with using the planes

---

4. Had Candi actually attempted to seek additional funds and had Guy denied her request, then we may have been faced with a different situation. However, the only time this occurred was in the time period between the court's January 2015 minute entry and its April 2015 written order on the subject, and the minute entry was not clear as to Guy's obligation to reimburse Candi for reasonable expenses in excess of $20,000 per month.

and boats. However, Candi never attempted to use the yacht or plane due to her concerns regarding the expense. Had she done so, she could have requested that Guy reimburse her for these costs in accordance with the court's temporary alimony award. Since Guy was using the marital assets to pay for the costs of the yacht and plane in addition to meeting his monthly needs, such a request would not have been "inappropriate or excessive." It is unfortunate that Candi was deterred from taking advantage of this option by the conditions Guy placed on the use of these assets. However, since she did not actually incur the expenses or seek reimbursement for extra expenses from Guy, Candi does not persuade us that the district court should have ordered an increase in her alimony or awarded her more of the marital estate under *Dahl* or *Brown* to make up for the disparity in access to the tangible assets.

C.     Attorney Fees

¶50     Candi next contends that the district court improperly assessed the attorney fees Guy paid out of the marital estate at only $800,000. This number was taken from Guy's testimony at trial that he had paid between $700,000 and $800,000 in attorney fees at that point. Candi argues that this estimate was made before Guy paid for the twelve days of trial and post-trial litigation and that "[t]he court should have ordered Guy to disclose all his attorney fees and attributed the full amount to his side."

¶51     However, although the Decree of Divorce did not go into effect until the end of 2018, the court valued the parties' marital estate based on the information before it at trial in 2017. Because this was the "snapshot in time," *see Marroquin v. Marroquin*, 2019 UT App 38, ¶ 24, 440 P.3d 757, on which the valuation of the marital estate was based, spending that occurred after that date could not have reduced the overall value of the estate. This means that any funds Guy expended on attorney fees following trial were necessarily post-division expenses. Even assuming that Guy spent more than $800,000 on attorney fees in total—

which he likely did, given that the $800,000 accounted only for what he had incurred as of trial—that does not necessarily mean that he paid for those fees out of the marital estate as it existed at the time of trial. He was obligated to pay Candi her share of the estate's value calculated based on the value proven at trial, regardless of any later spending.

### III. Valuation of the Marital Estate

¶52 Candi argues that the district court made several errors in assessing the overall value of the marital estate. Specifically, she asserts that it failed to account for the value of the notes receivable and that it used the wrong method to assess the value of WBC's backlog and equipment. She also asserts that Guy dissipated assets and that the estate should have been credited for the dissipation.

### A. Notes Receivable

¶53 The account ledgers for three of the parties' entities included line items for loans owed to Guy, totaling $1,059,466. The district court deducted these amounts from the value of those entities in calculating the overall value of the marital estate. However, the notes receivable, owed to Guy, were not counted as an asset of the marital estate. When Candi brought the matter to the court's attention, it found that "[t]he parties agree that the Court did not consider the three notes receivable" but rejected Candi's argument on the ground that "[n]either party points to the record regarding this issue." However, when the 2018 Supplemental Findings, drafted by Guy, addressed the matter, the court's finding evolved to "all Notes Receivable were included in the valuation of the various marital entities by the parties' experts."

¶54 Candi asserts that the court's findings are clearly erroneous and that the court therefore erred in refusing to include the notes receivable in the valuation of the marital estate. We agree with Candi that the trial evidence memorializing the

accounts payable to Guy constituted record evidence of Guy's notes receivable with respect to those entities. Thus, the court erred in finding that Candi had not "point[ed] to the record regarding this issue." Moreover, its finding in the 2018 Supplemental Findings that "all Notes Receivable were included in the valuation of the various marital entities by the parties' experts" is not supported by the evidence.[5] We are aware of nothing in the record indicating that any experts added the notes receivable to the valuation of the marital estate.

¶55     It was unreasonable for the court to include the accounts payable in its calculation of the other entities' liabilities without also crediting the notes receivable to Guy as an asset. The only evidence before the court concerning the notes receivable is that contained in the owing entities' ledgers—that Guy was entitled to receive the funds. Thus, it is necessary for the district court to adjust the value of the marital estate to include the $1,059,466 owing to Guy from the other entities.

B.     Backlog

¶56     Candi next asserts that the district court erred in assessing the value of WBC's backlog. She asserts that because WBC is a "viable business," the court should have recognized that it "has future work lined up and future work yet to come." Specifically, Candi takes issue with two of the court's findings relating to the backlog: (1) that "Candi did not provide counter-testimony to" Guy's witnesses' "statements of no value in the backlog" and (2) that one of Guy's witness had "testified that any potential

---

5. This finding also appears to be inconsistent with the court's previous ruling, in which it found that the values were *not* considered. Candi objected to the form of the findings prepared by Guy, pointing out this inconsistency, but the court rejected her objection, stating that it believed the notes were "considered in the Court's decision because the experts testified to the same."

purchaser would not purchase the company based on a backlog."

¶57 Candi points to the testimony of her own expert that the backlog would generate a net profit of $3,441,733. She further argues that Guy's expert's assertion that the profit would be eaten up with administrative costs and capital expenditures relies on a misguided "assumption that WBC would obtain *no* new work."[6] She points out that such an assumption was faulty, as "WBC had only one negative year in the . . . five-and-a-half years" prior to trial.

¶58 But Guy's expert's opinion that the backlog lacked value did not rely on the assumption that WBC would never get new work, as Candi asserts. Rather, it was based on his assessment that the backlog was not large enough to keep up with administrative expenses the company would need to incur, such as equipment costs, salaries, insurance, etc. Guy's expert explained that in assessing the value of the backlog, he examined "the general and administrative expenses in the current environment that both a buyer and seller would look at when they're examining whether or not this backlog has any value." Based on this examination, he concluded that "the backlog in its current state would start to absorb cash flow from a negative performance during the next eleven months"—in other words,

---

6. Closely related to this argument, and similar to her argument regarding the valuation of WBC's equipment, *see infra* Part III.C, Candi asserts that the court's determination that the backlog lacked value was erroneous "because it reflects a liquidation value for WBC rather than its value as a going concern." But this argument rests on Candi's assertion that Guy's witness and the court assumed WBC would obtain no new work. And as we discuss *infra* ¶ 58, neither the testimony nor the court's findings relied on such an assumption. Thus, we do not agree with Candi that either Guy's expert or the court relied on WBC's liquidation value to conclude that the backlog lacked value.

although WBC could expect to earn a gross profit from the backlog, it would have to dip into that profit to make up for its negative cash flow and would therefore not earn a net profit. This concept was further addressed by Guy in his testimony, where he explained that although WBC had a backlog, at the time of the evaluation it did not have as many contracts as it needed, had to lay off workers, and had to rely on capital to continue operating.

¶59 While Candi's expert testified that the backlog would generate a net profit of $3,441,733, he did not address the details about anticipated administrative costs or the state of the industry that Guy and his expert addressed in their testimonies, and this seems to be the absent "counter-testimony" to which the court was referring in its finding. Indeed, the court was clearly aware of and considered Candi's expert's testimony and valuation, as it included that information in its findings. But it nevertheless concluded that "Candi presented no other evidence or expert testimony in that industry regarding the backlog." Thus, the court's finding was not in error. And in any event, it was the court's prerogative to credit the testimony of Guy's expert over the testimony of Candi's expert. *See Henshaw v. Henshaw*, 2012 UT App 56, ¶ 11, 271 P.3d 837 ("It is within the province of the trial court, as the finder of fact, to resolve issues of credibility."); *see also Barrani v. Barrani*, 2014 UT App 204, ¶ 4, 334 P.3d 994 ("Courts are not bound to accept the testimony of an expert and are free to judge the expert testimony as to its credibility and its persuasive influence in light of all of the other evidence in the case." (quotation simplified)).

¶60 As to the court's finding regarding Guy's witness's testimony about a potential buyer, while that finding could have been more precise—the witness actually testified that a buyer cares only about a "sustainable backlog" and that a buyer would rely on "the backlog in front" of the company rather than its historic backlog—the imprecision ultimately does not convince us that the court relied on an erroneous assumption. The witness did not testify specifically regarding WBC's backlog, and his

actual statement ultimately supports the district court's finding regarding the value of the backlog. If the court applied the principle stated by the witness—that only the backlog in front of WBC was relevant—to the testimony it relied on that the backlog would not generate a net profit, the testimony was not inconsistent with the court's finding that the backlog lacked value.

¶61    Ultimately, it was within the court's discretion to accord each party's expert testimony the weight it deemed proper. And the testimonial evidence presented by Guy and his expert and witness supports the court's conclusion that the backlog lacked value. Even assuming that WBC was a viable company that would continue to generate contracts, the evidence supported a determination that its current contracts were not sufficient for the company to expect to generate a net profit.

C.    Equipment

¶62    Next, Candi challenges the district court's valuation of WBC's equipment. Her argument rests primarily on her assertion that the court erroneously used "liquidation value" to calculate the value of the equipment rather than valuing WBC as a "going concern."[7]

---

7. Candi also challenges two of the court's findings regarding the equipment and asserts that misstatements in those findings undermine the court's determination regarding the value of the equipment.

First, Candi challenges the court's finding that Guy "testified that auctions are the most common way that heavy equipment is bought and sold in the construction business" and "that if he needed a particular piece of equipment he would check Ritchie Bros. to see what was available." As Candi points out, this finding most closely reflects Guy's counsel's recap of the evidence, not testimony actually provided by Guy. In fact,

(continued…)

¶63     First, we agree with Guy that Utah law does not support Candi's contention that the court was required to evaluate WBC as a going concern. In fact, our case law is clear that courts have broad discretion in determining the proper method for calculating the value of marital property. *See DeAvila v. DeAvila*, 2017 UT App 146, ¶ 12, 402 P.3d 184 ("District courts generally have considerable discretion concerning property distribution

---

(…continued)
Guy testified that although Ritchie Brothers had made him an offer for his equipment, he had not actually done business with Ritchie Brothers in the past. Nevertheless, we are not convinced that this misstatement undermines the court's conclusion. Ample additional findings supported the court's determination, including its opinion that Guy's expert had provided a more thorough appraisal than Candi's expert and its reliance on the expert's testimony that auctions are commonly used to buy and sell heavy construction equipment and that his appraisal represented the fair market value of the equipment.

Second, Candi challenges the court's finding that there are "no approved standards" for appraising equipment. She asserts that her expert's testimony that the USPAP "provides a standard of value" and Guy's expert's testimony that "the majority of the equipment people use" USPAP demonstrates that there are approved standards for appraising equipment. But Candi's expert also testified that no specific qualifications are required to appraise heavy construction equipment. The fact that the USPAP "provides *a* standard of value" and that many appraisers use it does not mean that it is *the* approved standard that must be followed. (Emphasis added.) Ritchie Brothers described its valuation method as a "market approach" that took into account historical auction sales; "usage, attachments, options, and condition"; personal experience over the course of fifty years; and knowledge of world economic conditions. The court found this method to be reliable, and Candi has failed to point to any rule mandating that the USPAP standards be followed in this context.

and valuation in a divorce proceeding and their determinations enjoy a presumption of validity." (quotation simplified)); *cf. Griffith v. Griffith*, 1999 UT 78, ¶ 19, 985 P.2d 255 ("[T]rial courts have broad discretion in selecting an appropriate method of assessing a spouse's income and will not be overturned absent an abuse of discretion."). Moreover, courts may even reject all valuation methods presented by experts and elect to simply split the difference between multiple appraisals. *See Newmeyer v. Newmeyer*, 745 P.2d 1276, 1278–79 (Utah 1987) (upholding a court's decision to fix the value of a marital home by splitting the difference between the values presented by two experts); *Andrus v. Andrus*, 2007 UT App 291, ¶¶ 12–13, 169 P.3d 754 (upholding a district court's decision to average the value of stock on nine different relevant dates to reach the fair value of stock in the marital estate); *Barber v. Barber*, No. 961783-CA, 1998 WL 1758305, at *1 & n.1 (Utah Ct. App. Oct. 8, 1998) (holding that the district court acted within its discretion when it valued a business by averaging four appraisals provided by expert witnesses).

¶64    Generally, we will uphold a district court's valuation of marital assets as long as the value is "within the range of values established by all the testimony," and as long as the court's findings are "sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Morgan v. Morgan*, 795 P.2d 684, 691–92 (Utah Ct. App. 1990) (quotation simplified); *see also Weston v. Weston*, 773 P.2d 408, 410 (Utah Ct. App. 1989) (upholding a court's election not to apply a marketability discount to the value of stock in a closely held corporation, despite several experts recommending that such a discount be applied, because the value the court found was "within the range of values established by all the testimony").[8]

---

8. The only case Candi cites in support of her contention that the court was required to value WBC as a going concern is *Hogle v.*

(continued…)

¶65 Thus, even assuming that Guy's expert's valuation was "liquidation value," it would have been within the court's discretion to use that valuation, which was "within the range of values established by all the testimony," so long as the court adequately supported its decision with factual findings explaining its decision. *See Morgan*, 795 P.2d at 691–92. Here, not only did the court support its determination with detailed factual findings, but those factual findings make clear that it considered the auction value to represent the fair market value of the equipment, not the liquidation value.

¶66 In accepting Guy's expert's valuation over that of Candi's expert, the court explained that Guy's expert was more thorough because he examined each individual piece of equipment and took into account its condition, mileage, and hours. Additionally, the court found it relevant that 80% of Ritchie Brothers' "sales are directly to end users" and credited the expert's testimony that their appraisal was based on fair market value, specifically rejecting Candi's assertion that auction value was equivalent to the value in a "fire sale." The court also pointed out that even Candi's expert had used some sales data from auction houses to assess values. Based on this evidence, the court found that "[t]here is no indication that [Guy's expert's] evaluation does not reflect the actual marketplace price the parties could expect to receive upon sale" and adopted the

---

(…continued)

*Zinetics Medical, Inc.*, 2002 UT 121, 63 P.3d 80. *See id.* ¶ 20 (pointing out in dicta the general rule that "in the absence of actual liquidation a corporation must be valued as a going concern"). But that case involved the valuation of stock shares in the context of a forced purchase, not the equitable division of a marital estate. The rule articulated in *Hogle* has not been applied in the context of marital property division, and Candi has not convinced us that it should overcome the general rule granting courts wide discretion to assign value to marital assets.

$13,890,300 value provided by Guy's expert. We will not disturb the court's well-supported decision on this issue.[9]

D.     Dissipation

¶67     Candi next contends that "Guy dissipated assets at a time he understood that divorce was likely" and that the district court should have included the value of additional allegedly dissipated assets—over and above the money Guy spent on his girlfriend, which the court considered dissipation and accounted for as such—in its valuation of the marital estate.

¶68     "Where one party has dissipated an asset, hidden its value or otherwise acted obstructively, the trial court may, in the exercise of its equitable powers, value a marital asset at some time other than the time the decree is entered . . . ." *Goggin v. Goggin*, 2013 UT 16, ¶ 49, 299 P.3d 1079 (quotation simplified). In other words, "when a court finds that a spouse has dissipated marital assets, the court should calculate the value of the marital property as though the assets remained" and give "the other spouse . . . a credit for his or her share of the assets that were dissipated." *Id.*

---

9. We note that with respect to both the backlog and the equipment, our decision should not be construed as a determination that the court's findings were a foregone conclusion. Indeed, Candi also presented evidence that could have supported different findings regarding the value of both assets. However, because the court's findings fell within the wide range of its discretion, we are not in a position to disturb those findings. *See Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134; *Goggin v. Goggin*, 2013 UT 16, ¶ 26, 299 P.3d 1079; *see also Barrani v. Barrani*, 2014 UT App 204, ¶ 4, 334 P.3d 994 ("A trial court is free to accept or reject an expert's opinion and may accord that opinion whatever weight it deems proper." (quotation simplified)).

¶69 A number of factors may be relevant to this inquiry, including

> (1) how the money was spent, including whether funds were used to pay legitimate marital expenses or individual expenses; (2) the parties' historical practices; (3) the magnitude of any depletion; (4) the timing of the challenged actions in relation to the separation and divorce; and (5) any obstructive efforts that hinder the valuation of the assets.

*Marroquin v. Marroquin*, 2019 UT App 38, ¶ 33, 440 P.3d 757 (quotation simplified). Candi's dissipation argument concerns three transactions: (1) Guy's purchase of the yacht, (2) Guy's investment in FDFM, and (3) Guy's transfer of assets into the Trust.

1. Yacht

¶70 Candi first argues that the district court erred in concluding that the purchase of the yacht was not dissipation. Candi asserts that although the yacht itself remained in the estate, its rapid depreciation meant that it was "cash going out the door for no benefit." She also argues that because Guy used the yacht and she did not, any benefit from the use of the yacht was individual to Guy rather than to the marital estate.

¶71 Candi acknowledges that Utah law has not held that the purchase of a depreciating asset constitutes dissipation. But she nevertheless urges us to adopt such a rule, relying on case law from Illinois. However, even if we were inclined to find these cases persuasive, most of them appear to be distinguishable from the case at hand. For example, in *In re Marriage of Thomas*, 608 N.E.2d 585 (Ill. App. Ct. 1993), the court held that the devaluation of the parties' business constituted dissipation not simply because it had decreased in value but because the husband had directly undermined the business through "inattention" and "his failure to solicit additional clients or

through his outright stealing of clients for his new business." *Id.* at 587. In *In re Marriage of Schneeweis*, 2016 IL App (2d) 140147, 55 N.E.3d 1280, the court upheld a finding of dissipation where the husband had begun making "secretive, risky and progressively more destructive" financial decisions that were "inconsistent with the parties' prior practices." *Id.* ¶ 28 (internal quotation marks omitted). And in *In re Marriage of Block*, 441 N.E.2d 1283 (Ill. App. Ct. 1982), where the husband had purchased a racing boat that was financially under water, the court held that it could be considered "a debt in dissipation" but clarified that "there would be no net effect on the marital estate" if "the value of the boat is approximately the same as the amount of indebtedness." *Id.* at 1288–89.[10]

¶72　Here, the court found that the purchase of the yacht was consistent with "Guy's historical practice" of buying "planes and boats" and that there was no evidence "that Guy caused excessive diminution in value." Additionally, the court assigned to Guy all responsibility for the outstanding debt on the yacht, so any "debt in dissipation" caused by the yacht's purchase was resolved, *see id.* at 1288. While the yacht was used primarily by Guy, he did make it available to Candi, and he never transferred it out of the marital estate. We agree with Guy that the depreciated value of the yacht, alone, does not mandate a finding of dissipation, particularly where its purchase was consistent with purchases made during the marriage and there is

---

10. *In re Marriage of Hubbs*, 843 N.E.2d 478 (Ill. App. Ct. 2006), does support the argument that a district court *may* treat money as a dissipated asset when it is used to purchase a depreciating asset used primarily by one party. *Id.* at 485–86. But the case does not mandate that a court treat the asset this way, and therefore, even if we were to adopt its reasoning, it would not support a determination that the district court abused its discretion in this case by declining to treat the money used to purchase the yacht as a dissipated asset.

no indication that Guy's actions contributed to the depreciation.[11]

2. North Dakota Investment

¶73 Candi next claims that the district court should have valued FDFM based on the $1,129,000 Guy invested in it rather than its $734,000 value at the time of trial. She asserts that "had Guy not unilaterally made that poor investment, more money would have remained in the estate." According to Candi, because Guy did not consult her regarding the investment, he "acted obstructively" and should therefore be held accountable for the diminished value of the asset. *See Goggin v. Goggin*, 2013 UT 16, ¶ 49, 299 P.3d 1079 (quotation simplified).

¶74 However, the mere failure to disclose the investment did not mandate a finding that Guy acted obstructively. In fact, the evidence here supported the court's finding that Guy "never consulted with Candi on any business decisions that he made" throughout the marriage and that making business decisions without disclosing them to her was "well within the scope of his historical practices." Moreover, even where a party has acted obstructively, the decision whether to "value a marital asset at some time other than the time the decree is entered" is a matter within the court's discretion in its "exercise of its equitable powers." *Id.* (quotation simplified). We are not convinced that

---

11. Indeed, the rule suggested by Candi—that the purchase of a depreciating asset constitutes dissipation per se—is unworkable. The practical effect of this rule would be that every purchase of a vehicle, furniture, appliances, or essentially any personal property that does not retain its full value after purchase during the pendency of a divorce could subject the purchaser to a dissipation claim. We note that the case-by-case factor-based test outlined in *Marroquin v. Marroquin*, 2019 UT App 38, 440 P.3d 757, is a much more practical approach to assessing dissipation. *See id.* ¶ 33.

the court abused its discretion here. To the contrary, though we can sympathize with Candi's desire to be included in financial decision-making, the evidence clearly suggests to us, as it did to the district court, that the diminution of FDFM's value resulted from changes in the market, and there is nothing to indicate that the loss of value resulted from any deceptive or obstructive actions by Guy.

3.      Transfers to the Trust

¶75      Finally, Candi asserts that the district court should have considered the transfers to the Trust to constitute dissipation. She asserts that the timing of the transfers—after she filed for divorce the first time and before Guy confessed his affair— suggests that Guy transferred the funds in anticipation of the divorce. *See Finan v. Finan*, 949 A.2d 468, 475–76 (Conn. 2008) (collecting cases and explaining that the "majority" of "states allow trial courts to consider a spouse's dissipation of marital assets, that occurs *prior* to the spouses' physical separation, in determining the allocation of assets to each respective spouse"). She argues that even though the money is now beyond the reach of the district court, it should have ordered Guy to compensate her for the loss in value under a dissipation theory. *See Jefferies v. Jefferies*, 895 P.2d 835, 838 (Utah Ct. App. 1995).

¶76      While we agree with Candi that the court *could* have compensated her for the marital assets put into the Trust had it found dissipation, we do not agree that the court exceeded its discretion in finding that the transfers did not constitute dissipation. The court found that the transfers did not amount to dissipation because transferring assets to their children was consistent with the parties' practices during the marriage, beginning as early as 1993, and Candi had deferred to Guy to "run the parties' finances and estate" throughout the marriage. The court found "no evidence that Guy attempted to withhold information or cut Candi out from the estate planning process." And while the timing of the transfers *could* provide circumstantial evidence of dissipation, the parties' historical

practices and the lack of additional evidence suggesting obstructive intent on Guy's part support the court's determination that the transfers were not dissipation.

### IV. Division of the Estate and Equalization Payments

¶77 The parties raise various challenges to the district court's division of the estate and its order regarding the equalization payments. First, Candi asserts that the court erred by not awarding her a greater share of the marital estate directly. Second, she argues that the court erred by refusing to grant her security to help ensure that she actually receives her unpaid share of the estate. Third, both parties challenge the 5% interest rate set by the district court. Finally, Guy argues that the court should have ordered Candi to share in any transaction costs that may be incurred should he be required to liquidate assets to make the equalization payment.

### A.   Estate Division

¶78 Candi argues that the district court abused its discretion by—at least temporarily—awarding Guy the bulk of the estate and giving him five years to pay Candi her share. She argues that instead, the court should have done one or more of the following: (1) ordered Guy to pay Candi her share immediately; (2) awarded her a greater share of cash and retirement accounts; (3) awarded her the restaurants; (4) ordered Guy to liquidate investments, yachts, planes or spare equipment to pay Candi more cash up front; or (5) ordered larger annual payments in implementing the equalization payment schedule.

¶79 "When the district court assigns a value to an item of marital property, the court must equitably distribute it with a view toward allowing each party to go forward with his or her separate life." *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 27, 440 P.3d 757 (quotation simplified). In situations where the marital estate consists primarily of a single large asset, such as a business or stock, a common acceptable approach for the court to

take is to award the asset to one party and make a cash award to the other party. *See Taft v. Taft*, 2016 UT App 135, ¶ 56, 379 P.3d 890; *Argyle v. Argyle*, 688 P.2d 468, 471 (Utah 1984). This avoids the necessity for the parties "to be in a close economic relationship which has every potential for further contention, friction, and litigation." *Argyle*, 688 P.2d at 471 (quotation simplified).

¶80    In fashioning this type of marital property division, "a court has the ability to make equitable provisions for deferred compensation"—the keyword being "equitable." *Taft*, 2016 UT App 135, ¶ 60. One way to assess the equitability of the provisions is to examine whether the award affords one party "significantly more latitude to go forward with his [or her] separate life" than the other. *Id.* ¶ 61 (quotation simplified). It is also relevant whether the party required to pay the deferred compensation will be able to use the property to their unfair advantage at the expense of the person to whom the compensation is owed. *Id.* ¶¶ 59–60.

¶81    We agree with Guy that the specific division scheme selected by the district court—Guy receiving, on a temporary basis, a larger share of the estate, but with the obligation to make equalization payments to Candi—is not inequitable, so long as adequate security for the unpaid equalization payments is included. *See infra* Part IV.B. While the court may have been within its discretion to employ one or more of the other methods recommended by Candi, its numerous factual findings support its ultimate determination, and the deferred payment provisions, coupled with security, are sufficiently equitable to fall within its discretion.[12]

---

12. There were certainly some smaller liquid assets and business assets, such as the restaurants, that the district court could have awarded Candi to decrease the overall amount of the balloon payment. And had we been in the court's shoes, we might have

(continued…)

¶82 Candi asserts that the court's distribution of marital assets and its use of the equalization payment plan impermissibly gives Guy disproportionate access to the estate. She compares the facts of this case to those in *Taft v. Taft*, 2016 UT App 135, 379 P.3d 890, in which this court determined that a deferred payment plan that gave the husband discretion to dictate the amount of monthly

---

(…continued)

employed some of these methods. We are troubled by the district court's adoption of the paternalistic argument that merely because Candi had little business experience, she was not capable and should not be awarded any of the business assets. Not every business owner has extensive business experience, and even inexperienced business owners can succeed, often by hiring experienced managers to help run the business. Indeed, courts should be cautious about perpetuating inequalities established in the course of a marriage—perhaps due to an imbalance of power in the parties' relationship—as the parties move forward with their separate lives simply because such inequality had been established as the status quo. For example, in this case, it appears that Candi's inability to present evidence about what she "could or couldn't do with respect to employment" was based on the parties' practices while they were married. Candi testified that it was Guy who wanted her to be a stay-at-home mom and that he "insisted on taking care of all the finances." Although Candi wanted to be more involved in financial decisions, "it just wasn't worth the fight." While we understand the court's desire not to penalize Guy for continuing to act in a manner consistent with the parties' historic practices, *see supra* Part III.D; *infra* Part VI, we caution against perpetuating apparent inequalities in marital relationships by relying on parties' historic practices to divide and distribute the marital estate. Nevertheless, we are ultimately unpersuaded that the estate division structure chosen by the district court in this case was outside its wide discretion in such matters, as long as sufficient security for the unpaid portion is provided.

installments over ten years at a 2.13% interest rate was not equitable. *See id.* ¶¶ 59–60. Candi argues that just like in *Taft*, "the overall dynamics of the court's award more readily allow [Guy], with his immediate ability to use and enjoy the property awarded to him[,] . . . significantly more latitude to go forward with his separate life than [Candi] is afforded." *See id.* ¶ 61 (quotation simplified).

¶83 But *Taft* is distinguishable from the case at hand. First, the husband in *Taft* was permitted to decide the amount of the monthly payments to his ex-wife over the course of ten years between the time of the divorce decree and the time the balloon payment was due. *See id.* ¶ 59. His discretion was so absolute that the court observed he "could conceivably make . . . equal monthly payments of $1 for nine years and eleven months before making the final balloon payment . . . , thereby forcing [his wife] to wait ten years before realizing any real benefit from her property award." *Id.* Here, on the other hand, the district court set the terms of the payment plan, ultimately requiring Guy to pay Candi $30,000 per month plus an additional $500,000 per year. Although the court certainly could have ordered Guy to pay more, we are not convinced that the amount ordered was so inequitable as to fall outside the bounds of the court's discretion. Unlike the wife in *Taft*, Candi will not have to wait until the balloon payment is due to realize any benefit from her property award. Rather, she will receive $860,000 each year in addition to the money she has already received. While this leaves Guy in control of a substantial portion of Candi's property, she is at least able to benefit from her property award in the meantime.

¶84 Second, the interest applied to the property distribution in *Taft* was only 2.13%, an amount this court observed "provides very little incentive for [the husband] to substantially pay it prior to the expiration of the ten-year period, much less for him to pay [the wife] sizeable monthly installments." *Id.* ¶ 60. In fact, the low interest rate "would almost certainly allow [the husband] to

invest [the wife's] money elsewhere and reap the benefit of any additional increment of interest—a benefit that in fairness should accrue to [the wife]." *Id.* In this case, on the other hand, the district court applied a 5% interest rate, which it acknowledged was higher than the statutory postjudgment interest rate, to incentivize Guy to pay Candi sooner. *See supra* ¶ 31; *see also infra* Part IV.C. By setting interest at a rate calculated to discourage any delays in paying Candi, the court avoided the type of inequitable deferred payment plan at issue in *Taft*.

¶85 We acknowledge that granting Guy a five-year period in which to continue using the bulk of Candi's property award to grow his business does afford him a benefit that may, to some degree, come at Candi's expense. But we are convinced that it is not inequitable in light of the entire landscape of the marital estate and property division. First, the size of the parties' estate and the fact that the bulk of it is wrapped up in WBC means that gathering the liquid funds to pay Candi's property award is not something that can be accomplished overnight, at least not without substantially decreasing the overall value of the marital estate. Thus, it was reasonable for the court to allow Guy some period of time to gather the funds necessary to pay Candi. Second, this time period may allow Guy to keep his larger businesses intact and find other ways to pay Candi. Keeping the businesses intact will ultimately benefit both parties, as it will allow Guy to maintain his income and continue paying alimony to Candi. Finally, we take Guy's point that he may incur substantial transaction costs if he ultimately does need to liquidate assets to pay Candi. *See infra* Part IV.D. Thus, it seems to us that the hypothetical benefit Guy may incur by using Candi's share of the property to increase the value of the estate will be offset by the hypothetical detriment he could incur if he has to liquidate the assets. Since the court did not order Candi to share in any of these transaction costs, the court's decision to give Guy the use of Candi's portion of the property during the five-year forbearance period does not

strike us as inequitable, at least so long as adequate security is afforded to Candi.[13]

B.     Security

¶86     And this brings us to Candi's next argument: that the district court abused its discretion by imposing this specific deferred-payment arrangement *without* requiring Guy to provide adequate security. Candi asserts that the court's arrangement put her in the position—involuntarily—of an unsecured creditor and posits that no lender would agree to make a $15 million loan without some sort of security interest. Without any type of security, Candi argues, she stands to lose her ability to collect her share of the marital estate in the event Guy passes away before the balloon payment is due or he moves his assets into irrevocable trusts. We agree with Candi and emphasize that the district court's chosen arrangement passes

---

13. We observe that arrangements such as this should be reserved for only the most unusual cases. As we have already emphasized, in distributing marital property, courts should act "with a view toward allowing each party to go forward with his or her separate life," *Marroquin*, 2019 UT App 38, ¶ 27 (quotation simplified), and avoiding the necessity of parties continuing "in a close economic relationship which has every potential for further contention, friction, and litigation," *Argyle v. Argyle*, 688 P.2d 468, 471 (Utah 1984) (quotation simplified). The estate division and equalization payments in this case have the unfortunate result of keeping the parties tied together long after their divorce and depriving Candi of immediate access to her share of the estate. However, though we have reservations, because of the unusual circumstances of this case—i.e., the size of the estate coupled with the concentration of the estate's value in various non-liquid business entities that are difficult to divide—we cannot ultimately fault the court's resolution, so long as it secures Candi's interest in her share of the marital estate.

discretionary muster only if it comes accompanied by an adequate security mechanism.

¶87  The court's only justification for declining to grant Candi any type of security was its determination that it could not award a lien against the businesses, that the Uniform Commercial Code did not apply, and that life insurance was not an option due to Guy's health. But the court did not explain why these limitations prevented it from granting Candi any type of security. Candi's request was broad: she asserted that "there needs to be some kind of order or security or lien or whatever form it takes . . . that will ensure that those former marital assets are there at the time that . . . the balloon payment needs to be made." "So all we're asking for is some kind of order to ensure that there's going to be payment down the road."

¶88  Guy maintains that no security is necessary because he has shown himself to be reliable in making payments and does not have a history of hiding assets. But we agree with Candi that, regardless of Guy's history, character, or intentions, she should not be required to rely solely on Guy's continued health and goodwill to ensure her ability to collect what she is owed. Whether Candi's mistrust of Guy is warranted or not, it was unreasonable for the court not to grant her any type of security in her half of the marital estate.

¶89  Moreover, Candi has even greater cause for concern in light of Guy's age and poor health. In fact, Guy expressed concern that he might pass away before the divorce decree was finalized and relied on that possibility to argue that the divorce action should be bifurcated. Should Guy pass away before the balloon payment is due, Candi would no longer have even the benefit of Guy's goodwill. Instead, she would have to further litigate with his heirs (including her own children) to fight for her share of the marital estate. It is hard to reconcile why the district court considered this to be an adequate legal remedy. Candi should not have to take her chances as an unsecured creditor should Guy pass away before she can receive her share

of the marital estate. No reasonable creditor would agree to a forbearance on such terms, and it was therefore inequitable to impose such terms on Candi.

¶90  Accordingly, we remand this case for the court to fashion an equitable security interest that will adequately protect Candi's ability to collect her remaining share of the marital estate at the end of the five-year forbearance period.

C.  Interest Rate

¶91  Both Guy and Candi take issue with the 5% interest rate the district court imposed on the equalization payments. Guy asserts that the interest rate should have been set at the statutory postjudgment interest rate, which was 4.58% at the time the court entered the 2019 Supplemental Findings. Candi argues that the court should have imposed the 10% interest rate originally set in its 2018 Supplemental Findings. We reject both parties' arguments and affirm the district court's imposition of the 5% interest rate.

¶92  Guy asserts that the court was bound by the postjudgment interest rate established by section 15-1-4 of the Utah Code, which provides that "final civil . . . judgments of the district court . . . shall bear interest at the federal postjudgment interest rate as of January 1 of each year, plus 2%." Utah Code Ann. § 15-1-4(3)(a) (LexisNexis Supp. 2021). Section 15-1-4 does apply to orders in a divorce case "in relation to the children, property and parties." *See Marchant v. Marchant*, 743 P.2d 199, 207 (Utah Ct. App. 1987) (quoting Utah Code Ann. § 30-3-5(1) (1984) (current version at *id.* (LexisNexis Supp. 2021) (stating that the district court "may include in the decree of divorce equitable orders relating to the children, property, debts or obligations, and parties"))). However, section 15-1-4 provides the "*minimum* interest allowable." *Id.* (emphasis added). The statute "does not preclude a District Court, under [section 30-3-5] from imposing an interest rate of more than [the statutory postjudgment rate] where, under the circumstances, that award is reasonable and

equitable." *Stroud v. Stroud*, 738 P.2d 649, 650 (Utah Ct. App. 1987) (quoting *Pope v. Pope*, 589 P.2d 752, 754 (Utah 1978)). And, in fact, setting equalization payments at the postjudgment interest rate, rather than a higher rate, may be an abuse of discretion if doing so is inequitable under the circumstances. *See Taft v. Taft*, 2016 UT App 135, ¶¶ 56, 60, 379 P.3d 890 (finding a 2.13% interest rate, which was the rate provided by Utah Code section 15-1-4 at the time, to be insufficient where the husband was granted discretion to determine the amount of payments over the course of ten years because it incentivized the husband to invest the wife's money elsewhere rather than paying her sooner). Thus, we find no merit to Guy's contention that the court was bound to apply the default postjudgment interest rate to the equalization payments.

¶93 Candi argues that an interest rate higher than the 5% ordered by the court is necessary to "compensate Candi for her unwilling forbearance to Guy and incentivize Guy to pay quicker." She argues that 10% is an appropriate interest rate because it is consistent with the Utah Code's default interest rate for a "forbearance of any money, goods, or services." Utah Code Ann. § 15-1-1(2) (LexisNexis Supp. 2021). However, Candi has not provided us with any authority suggesting that the court was required to impose this specific interest rate.

¶94 The court's decision to impose the 5% interest rate was reasoned and supported by sufficient factual findings. The court explained that it had considered the 10% interest rate to be "appropriate" when the court had "deferred to Guy to come up with an appropriate payment plan." The court opined that had Guy been permitted to set the payment schedule, as the husband in *Taft* was, the 10% interest rate would have been needed to avoid giving Guy "an incentive to invest the money and reap the return instead of paying off" Candi. The court explained that once it set the payment plan, rather than leaving it to Guy's discretion, it did not believe the 10% interest would be valid under *Taft*. Nevertheless, it also explained that the interest rate was not a postjudgment rate because the deferred payment was

more akin to a forbearance, and it still wanted to give Guy "an incentive to pay the Equalizing Balance quickly."

¶95 Our case law is clear that as with other aspects of property division, equitability is the standard for evaluating the appropriateness of an interest rate set by the district court for deferred payments in a divorce. *See Olsen v. Olsen*, 2007 UT App 296, ¶ 25, 169 P.3d 765 ("The overriding consideration is that the ultimate division be equitable . . . ." (quotation simplified)). We are not convinced that the 5% interest rate fell outside the reasonable range of equitable interest rates the court could have selected. Moreover, the court clearly explained its reasoning. Thus, we will not disturb the 5% interest rate the court set.

D.     Transaction Costs

¶96 Finally, Guy asserts that the district court should have required Candi to share in any transaction costs that he may incur in the event he needs to liquidate assets to pay off Candi's share of the marital estate. He points out that taxes and other transaction costs associated with liquidating the businesses or any other large assets could be significant and that if the court does not require Candi to pay her portion of those transaction costs, it could substantially eat into his portion of the marital estate.

¶97 We do not disagree with Guy that *if* he is forced to liquidate assets, doing so may result in significant taxes and transaction costs to him. But it is by no means certain that such costs will be incurred. We do not generally expect courts to "speculate about hypothetical future [tax] consequences." *See Alexander v. Alexander*, 737 P.2d 221, 224 (Utah 1987) (refusing to reduce the value of a "stock-price-tied profit-sharing plan to account for tax liability" because the imposition of taxes was not certain); *see also Sellers v. Sellers*, 2010 UT App 393, ¶ 7, 246 P.3d 173 (holding that the district court was not required to consider potential tax obligations associated with a retirement account because the tax consequences were "speculative" and assumed

"massive withdrawals" from the account); *Howell v. Howell*, 806 P.2d 1209, 1213–14 (Utah Ct. App. 1991) (holding that the district court "did not err in refusing to adjust property distribution because of . . . theoretical [tax] consequences" of selling a second home). The valuation of marital property "is necessarily a snapshot in time," *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 24, 440 P.3d 757, and such a moment does not consider "the myriad situations in which the value of [the parties'] property might be positively or negatively affected in the future," *Sellers*, 2010 UT App 393, ¶ 7.

¶98 Moreover, excessive transaction costs were the very thing the equalization payments were intended to prevent. The court acknowledged that forcing the parties to immediately liquidate assets would significantly cut into the pie that would be available to divide between both parties. That is why the court awarded the bulk of the estate to Guy and gave him five years to pay Candi her portion. The court gave him unfettered discretion to determine how to gather the funds necessary to pay Candi. In doing so, it gave Guy free rein over the bulk of Candi's share of the estate, which he may use to continue building his businesses and wealth over the next five years. The benefit he may derive from using Candi's share of the estate may very well amount to much more than the interest Candi will receive at the 5% rate, which is all she will have access to until the balloon payment is due, yet she will not share in that benefit any more than she will share in any transaction costs Guy may incur.[14] *See supra* ¶ 85. The entire principal of Candi's portion will remain in Guy's control until he makes the balloon payment at the end of 2024.

---

14. The $30,000 monthly and $500,000 annual payments will provide her with $860,000 per year—less than the amount needed to cover the interest. Thus, Guy will maintain complete control over the principal of Candi's share of the estate throughout the five-year period and will actually owe her approximately the same amount as the original judgment by the time the balloon payment is due.

Furthermore, because the assets are in Guy's control, Candi will have no role in deciding how to liquidate the assets or which transaction costs to incur.[15]

¶99  Given the speculative nature of the potential taxes and transaction costs, as well as the full discretion Guy was given to determine whether and how to liquidate assets, it was not an abuse of discretion for the court not to order that Candi share in those costs.

## V. Alimony

¶100  The next set of challenges the parties raise concerns the district court's award of alimony to Candi. Guy asserts that the court exceeded its discretion in awarding any alimony whatsoever. Candi, on the other hand, asserts that the court should have increased the alimony award to account for her tax burden. She also argues that the court should have required Guy to either obtain life insurance or provide some other security to

---

15. Imagine, for example, that Guy found it necessary to sell one of the restaurants to satisfy Candi's deferred judgment. There may be any number of reasons, apart from transaction costs, to choose one restaurant over the other. Maybe one of the restaurants is more convenient for Guy to travel to, or maybe he feels that one will be more successful than the other down the road and bring him more income. Factors like this may make it reasonable for Guy to sell one of the two restaurants even though selling the other might result in fewer transaction costs. Because Candi will have no input on that decision, she would be stuck paying the higher transaction costs even though she would have been better off if Guy had sold the other restaurant. And of course, it should go without saying that Guy would incur minimal or no transaction costs if he decided simply to transfer the restaurants (or any of the other businesses) to Candi in partial payment of his obligation.

ensure that she would receive her alimony payments if he were to pass away.

## A.    Alimony Award

¶101 Guy argues that the district court should not have awarded alimony to Candi because (1) she did not provide the court with sufficient evidence from which it could calculate her monthly needs and (2) Candi's property settlement was sufficient to allow her to support herself. In support of both arguments, Guy primarily relies on our supreme court's holding in *Dahl v. Dahl*, 2015 UT 79, 459 P.3d 276. But *Dahl* neither automatically requires a court to deny a request for alimony in the absence of documentation nor prevents the court from awarding alimony to a spouse who receives a large property settlement.

¶102 With respect to documentation of need, the *Dahl* court held only that the district court "acted within its discretion in denying" the wife's alimony request when she failed to provide evidence supporting her claimed need, not that the district court was required to deny her request. *Id.* ¶ 117. In fact, the court explicitly acknowledged that "the district court *could have* . . . imputed a figure to determine [the wife's] financial need based either on [the husband's] records of the parties' predivorce expenses or a reasonable estimate of [the wife's] needs." *Id.* ¶ 116 (emphasis added). Furthermore, we have previously considered and rejected the "assertion that failure to file financial documentation automatically precludes an award of alimony." *Munoz-Madrid v. Carlos-Moran*, 2018 UT App 95, ¶¶ 8–9, 427 P.3d 420. "[A]lthough [Candi's] expenses may have been difficult to discern because she failed to provide supporting documentation . . . , there was not a complete lack of evidence to support their existence." *See id.* ¶ 10. Indeed, the court explained that it relied on the list of items in the standard financial declaration, Guy's financial declaration, evidence concerning the parties' spending during the marriage, and

evidence of Candi's expenses during the pendency of the divorce to calculate Candi's reasonable monthly needs.

¶103 *Dahl* also does not stand for the proposition that alimony should never be awarded to those who receive a large property settlement. Rather, *Dahl* merely states that receiving "a sufficiently large property award to support a comfortable standard of living" prevented "any serious inequity" from arising due to the court's decision not to impute the wife's need in the face of her lack of evidence. *See* 2015 UT 79, ¶ 116 (quotation simplified). We acknowledge that if the payee spouse has income-producing property, the income from that property "may properly be considered as eliminating or reducing the need for alimony by that spouse." *Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988); *see also Batty v. Batty*, 2006 UT App 506, ¶ 5, 153 P.3d 827 (holding that the evaluation of a payee spouse's ability to meet his or her own needs "properly takes into account the result of the property division, particularly any income-generating property [the payee spouse] is awarded"); *Burt v. Burt*, 799 P.2d 1166, 1170 n.3 (Utah Ct. App. 1990) (explaining that courts should distribute property before fashioning an alimony award, so they can take into account income generated from property interests). Nevertheless, the court in this case did not abuse its discretion by awarding alimony despite Candi's large property settlement.

¶104 Although Candi was entitled to receive a large settlement *eventually*, Guy continued to control the bulk of the parties' marital estate and would do so for the next five years. The court noted this in its determination regarding alimony, observing that "alimony was needed" because "Guy was unable to pay Candi the full value of the marital estate at this time." The court refused to take into account income Candi may derive from her portion of the marital assets in the future because that analysis

was "too speculative for the Court to consider."[16] However, it observed that "at such time as . . . Candi . . . receives income or other assets from her share of the marital estate, or from other sources, the Court will evaluate the amount, if any, by which those amounts may reduce her unmet financial needs and thereby reduce or eliminate Guy's alimony obligation." Thus, the court did not abuse its discretion in awarding Candi alimony, and any income she derives from the property settlement may be considered when she actually has control of that property.

B.   Taxes

¶105  On the other hand, Candi argues that the district court should have included her tax liability on alimony in its calculation of her needs. In calculating both a payor spouse's ability to pay and a payee spouse's needs, courts are generally expected to consider the person's tax liability. *See McPherson v. McPherson*, 2011 UT App 382, ¶ 14, 265 P.3d 839; *Andrus v. Andrus*, 2007 UT App 291, ¶¶ 17–18, 169 P.3d 754. In particular, it is plain error for a court to consider the tax consequences for one party in assessing their income and expenses but not for the

---

16. Although Candi was to receive interest payments on the property settlement, we do not think it an abuse of the district court's discretion not to include those payments in its assessment of Candi's ability to meet her own needs. The court classified these interest payments as compensation for Candi's forbearance on collecting her property settlement. To allow Guy to offset his alimony obligation with these interest payments strikes us as inequitable. Moreover, although Guy raised arguments asserting that his alimony should be reduced by future income once Candi receives her property, he does not appear to have specifically asked the court to include the interest payments in its calculation of Candi's current income and therefore failed to preserve any such argument for appellate review.

other party. *Vanderzon v. Vanderzon*, 2017 UT App 150, ¶¶ 45, 58, 402 P.3d 219.

¶106 In its findings, the court used Guy's net income to assess his ability to pay alimony. However, because Candi did not present evidence of her tax burden on any alimony award, the court did not consider her tax burden in assessing her need. We acknowledge that the court's ability to estimate Candi's taxes was hampered by Candi's failure to provide evidence of her anticipated tax liability. Nevertheless, it is certain that she will incur some tax burden, particularly in light of the fact that she will be taxed on any alimony payments she receives.[17] And we agree with Candi that it was inequitable for the court to consider Guy's tax burden when calculating his ability to pay without considering Candi's tax burden in assessing her needs. Thus, we remand the court's alimony award for the limited purpose of having the court make findings as to Candi's projected tax burden and adjust the alimony award accordingly.

C.      Life Insurance

¶107 Next, Candi asserts that the district court should require Guy to either obtain life insurance or provide a substitute for life insurance to secure his alimony payments. She points out that the court initially stated in its 2017 Findings that "Guy should provide a life insurance policy for Candi to cover alimony for a period of time sufficient to cover his obligation should he unexpectedly pass away." Although the court initially rejected Guy's argument that he should be required only to "use his best efforts to obtain life insurance," the court ultimately adopted Guy's proposed language in its 2018 Supplemental Findings

---

17. This especially should have been taken into account given the district court's entry of the Decree of Divorce on December 31, 2018, the day before a change in the tax laws, to allow Guy to receive the benefit of a tax deduction on the amount of alimony he pays to Candi.

stating that "there was no information as to whether or not Guy could or could not obtain a life insurance policy for such purpose nor the cost thereof." Candi asked the court to reconsider that finding and make the life insurance requirement mandatory. However, the court rejected that request and stated that its finding in the May 2018 Order was "sufficient." But while that finding indicated the court's intent "to ensure that Candi will receive the money awarded should [Guy] pass unexpectedly," it did not definitively decide the issue of whether Guy was required to obtain life insurance to secure his alimony obligation or if he was able to demonstrate an inability to comply with the court's direction. We are left wondering whether the court did, or did not, order Guy to obtain life insurance and are unable to ascertain the answer to this question from the court's rulings. Accordingly, we remand this issue to the district court to clarify its order.[18]

## VI. Contempt

¶108 Finally, Candi argues that the district court erred in declining to hold Guy in contempt for violating the Stipulation,

---

18. We note that this decision falls within the district court's discretion. Although it is not uncommon for a divorce decree to include provisions requiring a party subject to an alimony or child support order to obtain life insurance, *see, e.g.*, *Kartchner v. Kartchner*, 2014 UT App 195, ¶ 36, 334 P.3d 1; *Robinson v. Baggett*, 2011 UT App 250, ¶ 17, 263 P.3d 411, we acknowledge that such security is not mandatory. While Guy indicated to the court that he is unable to get new life insurance due to a health condition, it does not appear that Candi had the opportunity to challenge Guy's assertion or present evidence to the contrary. Moreover, the court ordered that Guy's alimony obligation would terminate upon "the death of either party." Unlike the property award, which belongs to Candi regardless of any circumstances that may change in the future, she is entitled to receive alimony from Guy only so long as he is living.

which the parties reached early on in the proceedings, that they would not "sell, gift, transfer, dissipate, encumber, secrete or dispose of marital assets" but that Guy could continue to manage WBC and conduct business "as he has in the past, which may include incurring debt, paying expenses and acquiring assets." "As a general rule, in order to prove contempt for failure to comply with a court order it must be shown that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988). In a civil contempt proceeding, these elements must be proven "by clear and convincing evidence." *Id.*

¶109 Candi asserts that the Stipulation's language allowed Guy to engage in business transactions only insofar as those transactions related to WBC. She argues that the "business hereinabove identified" language in the Stipulation is limited to "the management and control of" WBC and that the court therefore misread the Stipulation by not holding Guy in contempt for any transactions that were not directly related to WBC. But as Guy observes, the Stipulation also allowed the parties to engage in transactions "in the course of their normal living expenditures, ordinary and necessary business expenses and to pay divorce attorneys and expert fees and costs."

¶110 "We interpret language in judicial documents in the same way we interpret contract language," that is, "we look to the language of the [document] to determine its meaning." *Cook Martin Poulson PC v. Smith*, 2020 UT App 57, ¶ 24, 464 P.3d 541 (quotation simplified). We consider Guy's reading of the Stipulation to be more consistent with the plain language of that document. The provision giving Guy "the right to conduct the business hereinabove identified as he has in the past, which may include incurring debt, paying expenses and acquiring assets," properly refers to both the operation of WBC and normal living and business expenses.

¶111 Moreover, because contempt requires that the party knew what was required and intentionally refused to comply, *see Von Hake*, 759 P.2d at 1172, "for a violation of an order to justify sanctions, the order must be sufficiently specific and definite as to leave no reasonable basis for doubt regarding its meaning," *Cook*, 2020 UT App 57, ¶ 26 (quotation simplified). Even were we inclined to agree with Candi's more limited interpretation, we could not say that the language is so clearly limited to WBC that there could be "no reasonable basis for doubt regarding its meaning." *See id.* (quotation simplified).

¶112 The Stipulation allowed Guy to continue conducting normal transactions as he had in the past, and the district court found that "the transactions Candi complains of were consistent with Guy's historical practice of transferring assets from one entity to another or from one form into another" and that there was "no indication that [they] . . . were out of the ordinary." Candi does not challenge this finding. Thus, we conclude that the court did not exceed its discretion in declining to find Guy in contempt.

CONCLUSION

¶113 We conclude that the district court erred in failing to credit the value of the notes receivable to the marital estate. We also conclude that it erred in refusing to grant Candi a security interest to protect her right to receive her unpaid share of the marital estate. However, we affirm the district court's property valuation and distribution in all other respects.

¶114 As to the alimony award, we conclude that the district court erred in failing to account for Candi's tax obligation in its calculation of her need and remand for clarification of whether the court intended to order Guy to obtain security on Candi's alimony award. We affirm the alimony award in all other respects.

¶115 We also affirm the remaining orders and findings challenged on appeal, including the operative date of the Decree of Divorce, the equalization payment schedule, the court's finding that Guy did not dissipate marital assets apart from the money he spent on his girlfriend, and its decision not to hold him in contempt.

¶116 Consistent with our discussion in this opinion, we remand to the district court to adjust the marital property valuation, to make findings regarding Candi's tax liability and adjust the alimony award, to clarify whether Guy must obtain security on Candi's alimony award, and to enter orders necessary to adequately secure Candi's interest in her unpaid share of the marital estate.

————————